NATIONAL TREASURY EMPLOYEES UNION, et al., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, et al., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

Peter G. CRANE, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 90–2922 (TPJ), 90–3027 (TPJ) and 90–3044 (TPJ).

United States District Court, District of Columbia.

March 19, 1992.

Gregory James O'Duden, Barbara A. Atkin, Nat. Treasury Employees Union, Washington, D.C., for plaintiffs Thomas C. Fishell, Jan Adams Grant and Nat. Treasury Employees Union.

Jeffrey Stuart Gutman, U.S. Dept. of Justice, Federal Programs Branch, Susan Kay Rudy, Mary Ellen Goetten, U.S. Department of Justice, Civil Div., Washington, D.C., for defendants U.S., Richard Thornburgh, Stephen D. Potts, Charles Fager, Robert Gordon, and Office of Government Ethics.

Lloyd Norton Cutler, Kenneth Paul Stern, Wilmer, Cutler & Pickering, Washington, D.C., for amicus Common Cause.

Mark D. Roth, American Federation of Government Employees, Washington, D.C., for plaintiffs David E. Hubler and American Federation of Government Employees, AFL–CIO.

John Vanderstar, Covington & Burling, Washington, D.C., for plaintiffs Peter G. Crane, Richard Deutsch, William H. Feyer, Judith L. Hanna, Dr., George J. Jackson, Dr., Eduard Mark, Dr., Arnold A. Putnam, Seledia Shephard, Robert M. Sivak and Robert N. Spore.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

In November, 1989, Congress enacted comprehensive multititle legislation known as the Ethics Reform Act of 1989 (the "Act"), 5 U.S.C. app. §§ 501 *et seq.*, Pub.L. No. 101–194, 103 Stat. 1760, intended to reinforce standards of integrity within the federal government, both in fact and in the public's perception. Among its manifold provisions the Act undertook to expand the existing restrictions upon off-the-payroll money-making activities of current federal officeholders in all three branches of the U.S. government. One of the activities Congress found suspect, as tending to corrupt (or appearing so), was the venerable practice of some government officeholders—most conspicuously, Members of Congress themselves—of accepting "honoraria," i.e., generally a payment of more than token value, from private sources having more than a selfless interest in how the government governs, in return for some ostensibly unrelated and otherwise appropriate act or service, such as a speech to a business convention or an article for a trade journal. Title VI of the Act, imposing limitations on outside earned income, included a provision purporting to prohibit the receipt of honoraria by virtually anyone in federal service.

In these consolidated cases for declaratory and injunctive relief, two national unions (and one local union chapter) of federal employees, and numerous Executive Branch career civil servants individually, contend that Title VI of the Ethics Reform Act of 1989, to the extent it prohibits their acceptance of payments for their own lawful outside activities, imposes unconstitutional inhibitions on fundamental rights vouchsafed to them by the U.S. Constitution. They ask that the Court so adjudge and declare, and that the United States, and its several officials charged with enforcement of the Act, be enjoined from doing so as to them.

The individual plaintiffs are currently employed full-time by various Executive Branch departments and agencies of the U.S. government. None of the plaintiffs

hold political appointments, elective office, or positions in the Legislative Branch. Each, using his or her own time and personal resources, and in all respects in accordance with the regulations of their respective departments and agencies antedating the effective date of the Act, has written or spoken for valuable consideration on a variety of subjects.[1] The Act will prohibit their doing so in the future. They may continue to write or speak if they wish, but not for pay as they have done in the past.

The case is presently before the Court on cross-motions for summary judgment. No material issues of fact stand as an impediment.

Plaintiffs contend that the offending provision of Title VI, 5 U.S.C. app. § 501(b) (hereinafter "Section 501(b)"), violates their rights under the First and Fifth Amendments to the Constitution, and that the implementing regulations, issued by the Office of Government Ethics ("OGE"), 56 Fed.Reg. 1721 (1991) (to be codified 5 C.F.R. § 2636), are "arbitrary and capricious" in violation of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* ("APA").[2]

Section 501(b) states in pertinent part: [a]n individual may not receive any honorarium while that individual is a Member [of Congress], officer or employee [of any of the three branches of the federal government].

"Honorarium" is defined in Section 505(3) as:

a payment of money or any thing of value for an appearance, speech or article by a Member, officer or employee, excluding any actual and necessary travel expenses incurred by such individual (and one relative) to the extent that such expenses are paid or reimbursed by any other person, and the amount otherwise determined shall be reduced by the amount of any such expenses to the extent that such expenses are not paid or reimbursed.[3]

The statute thus prohibits employees from receiving compensation for such private activities as writing non-fiction articles, presenting papers at conferences or meetings, serving as expert witnesses, and giving lectures or conducting seminars in their fields of interest. Plaintiffs, federal employees who do some or all of the above as a second profession or avocation,[4] face civil penalties and possible disciplinary action if they continue to receive compensation for their expressive activities while the statute remains in effect.

No one or more of the relevant Supreme Court cases in the constitutional firmament so far cited by the parties affords a firm fix on the analysis appropriate to a decision in this case. The cases, however, establish what may be considered lines of position, and from the various points at which those lines of position intersect it is possible to dead-reckon to a result.

## I.

Plaintiffs assert for a start that Section 501(b) "directly and substantially" burdens

---

1. Plaintiffs include, for example, a Nuclear Regulatory Commission lawyer who writes on Russian history (Crane); a Voice of America editor whose many published articles are generally on matters of international economics (Deutsch); a microbiologist at the Food and Drug Administration who reviews dance performances for print and broadcast media (Jackson); a tax examiner for the Internal Revenue Service whose avocational writing is on outdoor and environmental subjects (Grant); and a civilian electronics technician for the U.S. Navy and a spare-time scholar/author on ironclad vessel technology of Civil War vintage (Putnam).

2. The regulations promulgated by the OGE apply only to employees of the Executive Branch. 5 U.S.C. app. § 503.

3. "Appearance" excludes "performances using an artistic, athletic or other such skill or talent or primarily for the purpose of demonstration or display." 56 Fed.Reg. 1725 (1991). "Speech" does not include "recitation of scripted material, as for a live or theatrical production," or the "conduct of worship services or religious ceremonies." 56 Fed.Reg. 1725 (1991). "Article" does not include "works of fiction, poetry, lyrics, or script." 56 Fed.Reg. 1726 (1991).

4. Also named as a plaintiff is National Treasury Employees Union ("NTEU") Chapter 143. NTEU brought suit on behalf of its members, and Chapter 143 is a named plaintiff because the statute has, it alleges, interfered with its ability to publish its newsletter.

their First Amendment rights of free speech by depriving them of any financial incentive to speak or write; in fact, in many cases it operates as a disincentive, in that they are unable even to recoup necessary out-of-pocket expenditures connected with their non-governmental writing or speaking activities. Defendants respond that the plaintiffs remain in all respects able to speak or write as they have in the past. They are simply no longer entitled to be paid for it. Thus, they say, Section 501(b) should be regarded as merely an "incidental and indirect" burden on plaintiffs' First Amendment rights.

Any lingering uncertainty as to whether a law operating as a financial disincentive to constitutionally protected expressive activity represents a "direct," as distinguished from an "incidental," burden, however, was dispelled by the Supreme Court's recent decision in *Simon & Schuster, Inc. v. New York State Crime Victims' Board,* — U.S. ——, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) holding that a state statute expropriating, for the victims' benefit, monies paid to an accused or convicted criminal for his or her first-person account of the crime violated the First Amendment. Acknowledging that the state's legislative purpose was to compensate for harm done, not to suppress the thought expressed, the Supreme Court nevertheless found the financial burden alone a sufficient inhibition of protected speech to offend the Constitution although the speaker remained at liberty to speak for free.[5]

The law at issue in *Simon & Schuster* was, however, a "content-based" statute in the opinion of the Supreme Court. Only income derived from expressions of the criminal's "thoughts, feelings, opinions or emotions" regarding his crime was subject to confiscation. *Id.* 112 S.Ct. at 505. The state had "singled out speech on a particular subject for a financial burden that it places on no other speech and no other income," the Supreme Court said. Thus even an avowedly "compelling" state interest in "compensating victims from the fruits of crime" was insufficient to save such a law not "narrowly tailored" to that otherwise commendable end. *Id.* at 512.

Section 501(b) of the Act, on the other hand, is arguably "content-neutral." Any "speech" or "article" on any subject, or an "appearance" anywhere, by federal employees (excluding those purportedly excepted by the OGE regulations) is proscribed if done for pay. Thus *Simon & Schuster* is distinguishable, and is apposite to this case principally only insofar as it reinforces the conclusion as to the "direct" nature of the burden imposed by financial penalty laws on protected speech. The Supreme Court expressly declined in *Simon & Schuster* to address the distinctions, and formulate a rule for a content-neutral statute of similar import. *Id.*, fn.*, at 511.

II.

Content-neutral regulatory legislation that also operates nevertheless to inhibit constitutionally protected expressive activity has most recently been addressed by the Supreme Court in *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), upholding a municipal regulation governing sound-amplification technology to be used for musical events in a city park.[6] Observing that music no less than speech is protected by the First Amendment, but that abatement of excessive noise is of legitimate civic concern, the Supreme Court stated:

*Leathers v. Medlock,* —— U.S. ——, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991).

**6.** *See also Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

**5.** Financial or economic penalties of one sort or another imposed upon constitutionally protected conduct have consistently been held by the Supreme Court to represent a direct burden. *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988); *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); *Riley v. National Federation of the Blind,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). *See also*

Our cases make clear ... that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' (quoting *Clark v. CCNV*, 468 U.S. 288, 293 [104 S.Ct. 3065, 3069, 82 L.Ed.2d 221] (1984)).

*Id.* 491 U.S. at 791, 109 S.Ct. at 2753.

There was, of course, a "governmental interest" at least as significant as noise abatement in universal contemplation when Section 501(b) of the Ethics Reform Act of 1989 was under consideration by Congress. Abuses of the "honoraria" custom and practice were well-documented, as was the consequent erosion of public confidence in the integrity of the government, and had been common public knowledge for many years.[7] And Section 501(b) certainly obstructs no "channel" of communication. So long as federal employees receive no profit for their expressive labors, the world is their stage.

But Section 501(b) does not purport to be a "time, place and manner" regulation such as that at issue in *Ward*. It prohibits all speech-for-profit by federal employees, no matter when or where, or the medium employed. It thus "discriminate[s] among speakers" (i.e., among federal officeholders and everyone else), and "impose[s] direct quantity restrictions" (i.e., a total ban), on compensated expressive activities of the former, albeit in a worthy cause. *Buckley v. Valeo*, 424 U.S. 1, 18, 96 S.Ct. 612, 634, 46 L.Ed.2d 659 (1976).

Section 501(b)'s defenders observe, however, that governmental employees have always (at least in recent times) been *sui generis* insofar as they may avail themselves of constitutional rights that private individuals enjoy without limitation. For nearly a half century the Supreme Court has recognized that certain liberties of the most fundamental sort for private citizens of a representative democracy may, consistently with the Constitution, be denied to the same citizens when they enter upon government employment. *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (upholding provisions of Hatch Act, § 9(a), prohibiting partisan political activity by federal employees, against challenges under First, Fifth, Ninth, and Tenth Amendments); *see also U.S. Civil Service Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

### III.

In the seminal modern case directly addressing the freedom of speech of civil servants in particular, as distinguished from their political activity, *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court reversed a state court decision sustaining the dismissal of a public school teacher for publishing a letter critical of the board of education for whom he worked. The issue on which the outspoken teacher had expressed himself being one of some public importance, the Supreme Court held, in the absence of proof that the teacher's own performance of duty had suffered, or that he had thereby interfered with the regular operation of the schools generally, the school board's governmental interest in inhibiting his utterances was "not significantly greater than its interest in limiting a similar contribution by any member of the general public." *Id.* at 573, 88 S.Ct. at 1737.

In so holding, however, the *Pickering* court observed that a government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." The constitutional validity of any such regulation depends upon the balance between the governmental inter-

---

7. *See, generally,* Memorandum of Points and Authorities of *Amicus Curiae* Common Cause in Support of Defendants, May 20, 1991, pp. 6–12.

*See also Buckley v. Valeo*, 424 U.S. 1, 26–27, 96 S.Ct. 612, 638–39, 46 L.Ed.2d 659 (1976).

ests "in promoting the efficiency of the public services it performs through its employees," and the interests of the employees, as citizens, "in commenting upon matters of public concern." *Id.* at 568, 88 S.Ct. at 1734.[8]

The defenders of Section 501(b) point to that *dictum* from *Pickering* as evincing a recognition by the Supreme Court that a sufficiently significant relationship between potentially disruptive "speech" by governmental employees and the efficiency of the civil service will legitimate an otherwise constitutionally dubious proscription. Section 501(b) is not, however, addressed to the *speech* of public servants as such, whatever its subject matter, or even to expressive activity of any sort entitled to constitutional protection. It prohibits *conduct*, specifically, the receipt of money, and it is expressly intended to suppress an idea, or more precisely, a perception, accurate or not, which is altogether unworthy of any protection whatsoever; namely, that government favor may be bought, with payment to be made in the guise of an honorarium.

### IV.

Turning to the seminal modern case addressing conduct-as-speech, or "symbolic speech," i.e., the expression of an idea by deed rather than word, *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), holds that Congress may constitutionally prohibit the intentional mutilation of draft cards notwithstanding it is done in protest of an unpopular governmental policy. The Supreme Court said that

[w]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.... [A] governmental regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restrictions on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 376–77, 88 S.Ct. at 1678–79.[9]

### V.

■ Applying the teaching of the foregoing cases to Section 501(b) of the Ethics Reform Act of 1989, certain principles are easily discerned.

First, it is abundantly clear, and by none disputed, that Congress has not only the constitutional power but the duty as well to promote the integrity of, and popular confidence in and respect for, the federal government. Indeed, it would be difficult to conceive of a governmental interest more vital to the survival of a democratic form of government.

Second, Section 501(b) is content-neutral to the extent it inhibits expressive activity by rendering it unremunerative. A federal employee is no less dissuaded by it from making public exhortations to civic virtue than from calls to arms in revolt.

---

8. What may be a "matter of public concern" may depend upon the eye of the beholder. *Compare Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (county employee's statement of approval of Presidential assassination constitutionally protected) with *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (assistant prosecutor's intra-office circulation of questionnaire critical of district attorney following her notice of unwanted transfer constitutionally unprotected as being a matter of "personal interest").

Plaintiffs here do not rely upon any presumed importance of their activities to the public weal to justify their right to pursue them for profit.

9. Subsequent cases involving the constitutionality of the impact of regulatory legislation upon communication-by-conduct have concentrated primarily upon the extent to which the purpose of the legislation has been to suppress expression rather than to accomplish a legitimate noncensorial objective. *See, e.g., Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (statute prohibiting offensive displays in vicinity of foreign embassy unconstitutional); *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (statute prohibiting flag-burning as "desecration of venerated object" unconstitutional).

Third, no issue is taken with the proposition that Section 501(b) is conduct- rather than expression-oriented. Corruption, not criticism, is its central target.

Fourth, plaintiffs here are all government employees who, as a condition of their employment, have relinquished certain First Amendment prerogatives that their fellow citizens in private life retain unfettered. One such prerogative is the right to speak freely, certainly on matters of purely personal interest, without concern for the possible harm it may do to the legitimate interests of their employer or the employer's anticipated displeasure.

Nevertheless, in each of the foregoing classes of cases the Supreme Court has found, as a *sine qua non* of constitutional legitimacy for regulatory legislation having the effect of suppressing freedom of expression to the slightest degree, that the law in question go no farther than necessary to accomplish its objective in vindicating even the most significant of governmental interests. Such a law must, as the Supreme Court has said time and again, be "narrowly drawn" or "finely tailored" to that end, and it must not discriminate between speakers or speech indistinguishable from one another insofar as its regulatory objective is concerned. *See Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *Carey v. Brown*, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980). In neither respect, it seems, will Section 501(b) thus survive scrutiny.

The phenomenon of the sinister "honorarium" that Section 501(b) was expressly written to exterminate presupposed the conflux of private money and governmental power in a context in which the latter might be bent to the service of the former. It presumed some relationship between the federal officeholder/speaker and his audience giving rise to an apprehension (with or without justification) that payment for the speech was in reality payment for some occult benevolence the speaker was in a position to bestow.

Yet Section 501(b) is not so limited. No official nexus or relationship between the officeholder and those for whom he would speak or write is contemplated by the statute. Payments for a "speech" or an "article" are proscribed to federal employees even when there is neither the possibility nor a perception that the office and the payment are interdependent.

Moreover, Section 501(b) prohibits only speeches, articles, or appearances for profit by federal employees. It makes no mention of the myriad other forms of expression for which payments could lawfully be made to and received by the same employee on the same subject from the same supplicant in quest of the same governmental favor—a work of fiction such as a novel, for example, or a musical score; a painting; an object of handicraft; a lesson in some art or skill; a film or videotape; even a congratulatory letter or · telegram—as OGE's implementing regulations clearly reflect (without, it should be noted, any legislative warrant).

In the case of *Carey v. Brown*, 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), the Supreme Court struck down a state residential-neighborhood anti-picketing statute, on Equal Protection as much as First Amendment grounds, because it contained an exception for picketing in connection with a labor dispute. Acknowledging that the purpose of the statute was to ensure the privacy in his home of the object of the picketing, the Supreme Court observed that the labor picketing it continued to allow was "equally likely to intrude on the tranquility of the home." *Id.* at 462, 100 S.Ct. at 2291.

First, the generalized classification which the statute draws suggests that [the state] itself has determined that residential privacy is not a transcendent objective: While broadly permitting all peaceful labor picketing notwithstanding the disturbances it would undoubtedly engender, the statute makes no attempt to distinguish among various sorts of nonlabor picketing on the basis of the harms they would inflict on the privacy interest. The apparent overinclusiveness and underinclusiveness of the statute's

restriction would seem largely to undermine appellant's claim that the prohibition of all non-labor picketing can be justified by reference to the State's interest in maintaining domestic tranquility.

More fundamentally, the exclusion for labor picketing cannot be upheld as a means of protecting residential privacy for the simple reason that nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy. Appellant can point to nothing inherent in the nature of peaceful labor picketing that would make it any less disruptive of residential privacy than peaceful picketing on issues of broader social concern. Standing alone, then, the State's asserted interest in promoting the privacy of the home is not sufficient to save the statute.

The second important objective advanced by appellant in support of the statute is the State's interest in providing special protection for labor protests.

. . . . .

The central difficulty with this argument is that it forthrightly presupposes that labor picketing is more deserving of First Amendment protection than are public protests over other issues....

. . . . .

Appellant's final contention is that the statute can be justified by some combination of the preceding objectives. This argument is fashioned on two different levels. In its elemental formulation, it posits simply that a distinction between labor and nonlabor picketing is uniquely suited to furthering the legislative judgment that residential privacy should be preserved to the greatest extent possible without also compromising the special

protection owing to labor picketing. In short, the statute is viewed as a reasonable attempt to accommodate the competing rights of the homeowner to enjoy his privacy and the employee to demonstrate over labor disputes. But this attempt to justify the statute hinges on the validity of both of these goals, and we have already concluded that the latter—the desire to favor one form of speech over all others—is illegitimate.

*Id.* at 465–68, 100 S.Ct. at 2292–94 (footnotes omitted).[10]

Section 501(b) falls victim upon dissection to a similar appraisal. To the extent that it prohibits federal employees' acceptance of payments for all scholarly labors in speech or article form, no matter the absence of a relationship between the subject matter of their expressive works, their government jobs or their audience, or the identity and the motives of the persons who are paying for their efforts, it is over-inclusive. That it permits poets and musicians, or artisans and artists, to receive such payments while speechmakers and non-fiction writers cannot, despite the presence of a relationship giving rise to the suspicions that Section 501(b) sought to allay, the statute belies the notion that the governmental interest in suppressing questionable payments is paramount to all others, and renders it simultaneously under-inclusive.

### VI.

■ It remains to be considered whether Section 501(b), or, more precisely, whether the section as applied to the Executive Branch federal employee/plaintiffs here, is severable from the remainder of the Act. It is axiomatic that severability questions

---

**10.** In a different but related context the U.S. Court of Appeals for the District of Columbia Circuit has said, in invalidating a legislative provision deemed by the Federal Communications Commission to give it regulatory authority to treat similarly situated· broadcast licensees differently, that such "claims lie at the intersection of the First Amendment's protection of free speech and the Equal Protection Clause's requirement that government afford similar treatment to similarly situated persons." *News America Publishing, Inc. v. Federal Communications Commission,* 844 F.2d 800, 804 (D.C.Cir.

1988). "Where legislation affecting speech appears underinclusive, *i.e.,* where it singles out some conduct for adverse treatment, and leaves untouched conduct that seems indistinguishable in terms of the law's ostensible purpose, the omission is bound to raise a suspicion that the law's true target is the message. Accepting that intuition without making an actual determination of the legislators' motives, the Supreme Court has for the regulation of speech insisted on a closer fit between a law and its apparent purpose than for other legislation." *Id.* at 804–05.

are answered by reference to legislative intent. *See Sutherland Stat. Const.,* § 44.03 (4th Ed.1986).

This legislation is notable for the absence of a paper trail left in the wake of its passage through Congress.[11] This would be curious for an Act of this magnitude, were it not for the fact that the legislation was partly the product of a Bipartisan Task Force of the House of Representatives, possibly sensitive to the prospect of unwelcome publicity for another of the provisions of the Act raising Congressional salaries. Although the legislative history yields no direct evidence of Congress' intention regarding severability, it is helpful in supplying information necessary for the Supreme Court's mandated analysis of how to proceed in the absence of direct evidence.

A succession of Supreme Court cases has held that, in the absence of a severability clause, or direct evidence of legislative intent, a statutory provision is presumed severable if what remains after severance "is fully operative as law." *I.N.S. v. Chadha,* 462 U.S. 919, 934, 103 S.Ct. 2764, 2775, 77 L.Ed.2d 317 (1983), citing *Champlin Refining Co. v. Corporation Comm'n,* 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932); *see also Regan v. Time, Inc.,* 468 U.S. 641, 652–53, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). The severability inquiry evaluates "whether the statute will function in a *manner* consistent with the intent of Congress." *Alaska Airlines v. Brock,* 480 U.S. 678, 685, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987) (challenge to employee protection provision of Airline Deregulation Act) (emphasis in original).

[T]he unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.

*Id.*[12] Indeed, the Supreme Court has proclaimed a general bias toward preserving the vitality of as much of a Congressional enactment as possible in its familiar pronouncement that the "cardinal principle of statutory construction is to save and not to destroy." *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937); *see also, Tilton v. Richardson,* 403 U.S. 672, 684, 91 S.Ct. 2091, 2098, 29 L.Ed.2d 790 (1971).

There are several reasons that yield the conclusion that Section 501(b) is severable. First, the Report of the Bipartisan Task Force (issued *after* the Act had been passed) discloses that it was the honoraria-related activities of *Members of Congress* that gave greatest concern, indicating that the prohibition on the receipt of honoraria by other members of the government workforce was not of pivotal importance to passage of the Act. Witness, for example, the Task Force's description of the purpose of the honoraria limitations predating passage of the Act:

The current limitations on outside earned income and honoraria were prompted by three major considerations: First, substantial payments to a *Member of Congress* for rendering personal services to outside organizations presents a significant and avoidable potential for conflict of interest; second, substantial earnings from other employment is inconsistent with the concept that being a *Member of*

---

11. Such legislative history as exists can be found at: 135 Cong.Rec. H8747 (Nov. 16, 1989) (passed the House); 135 Cong.Rec. S15972 (Nov. 17, 1989) (passed the Senate); 135 Cong. H9253 (Nov. 21, 1989) (Report of the Bipartisan Task Force); 135 Cong.Rec. H9717 (Dec. 11, 1989) (a summary of the Act, as well as its full text); and 136 Cong.Rec. H1645 (April 24, 1990) (technical amendments, not relevant to the Provision at issue here).

Although the bill, as H.R. 3660, was referred jointly to the Committees on Rules, House Administration, the Judiciary, Standards of Official Conduct, Ways and Means, and Government Operations, only the Rules Committee issued a report.

12. *See also Brockett v. Spokane Arcades,* 472 U.S. 491, 502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985) (holding that a moral nuisance statute with an overbroad definition of "prurient" should not have been struck down in its entirety, since the statute without the offending provision retained its effectiveness as regulation of obscenity). The Court cited its own language, from 1881, that "the same statute may be in part constitutional and in part unconstitutional, and [ ] if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected." *Allen v. Louisiana,* 103 U.S. 80, 83–84, 26 L.Ed. 318 (1881).

*Congress* is a fulltime job; and third, substantial outside earned income creates at least the appearance of impropriety and thereby undermines public confidence in the integrity of public officials. 135 Cong.Rec. H9256 (Nov. 21, 1989) (emphasis added). The Task Force Report, even though ultimately recommending a ban on *all* honoraria for *all* employees, follows the foregoing passage with numerous paragraphs suggesting that only the honoraria received by *Members of Congress* was at issue. The entire discussion relates to the growth in numbers and amount of honoraria accepted by Members; tax shelters set up by Members; the increasing evidence of an intent to purchase the vote of Members on the part of those offering honoraria, and so forth. Nothing is said to suggest that the extension *vel non* of Section 501(b) to all federal employees was a "dealbreaker" provision, and the bill was ultimately passed with provisions that treated even honoraria for Representatives and Senators separately and differently.

Second, there is little in the floor debates to suggest that Section 501(b) was of such paramount importance and that the Act would not have survived without it. Although there is some language that suggests that an "honoraria ban" generally was the "heart" of the ethics reform effort,[13] the references to it on the floor of Congress, as in all other places, appear in context implicitly to address the restrictions on the receipt of honoraria by Representatives and Senators only. Much of such language as pertains to honoraria at all is purely rhetorical and hyperbolic, and it is obvious from the many pages of debate on matters other than the honoraria issue that Congress was *not* particularly preoccupied with Executive Branch civil servants covertly manipulating their functions to the advantage of private interests by taking payment for articles and speeches.

It is abundantly clear, however, from the entire history of the Act, that what Congress was principally concerned about was a Member of Congress receiving money from a constituent group in such a fashion that it created an appearance of impropriety and of undue influence.[14] In summary, there are a wide variety of reasons to conclude that Congress would have enacted the Ethics Reform Act of 1989 even without the extension of Section 501(b) to all federal employees, whether or not it would have done so had the House of Representatives escaped its clutches.

For the foregoing reasons, therefore, it is, this 19th day of March, 1992,

ORDERED, ADJUDGED, and DECLARED, that Section 501(b) of the Ethics Reform Act of 1989, 5 U.S.C. app. §§ 501 *et seq.*, Pub.L. No. 101–194, 103 Stat. 1760 (1989) is unconstitutional insofar as it applies to Executive Branch employees of the United States government; and it is

FURTHER ORDERED, that defendants United States of America, William P. Barr, and Stephen D. Potts, in their official capacities, and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, are hereby permanently enjoined from enforcement of Section 501(b) against any Executive Branch employee of

---

**13.** During the course of the debate in the Senate on Nov. 17, 1989, Sen. Mitchell expressed the view that the honoraria ban is the "heart of the principal reform in ethics in this legislation." 135 Cong.Rec. S15972. Sen. Grassley, responding, disagreed that this was so. 135 Cong.Rec. S15973–74.

**14.** In the House, on November 16, 1989, for example, Rep. Martin introduced the bill stating:

[The bill] reforms the ethics processes *of the House,* removes the *stigma that this House* ... can be used or misused by outside interests, and I hope will begin to restore a measure of faith that must be had between those who govern and those who are the governed.... It was a genuine concern for the *future of this House and our own reputations* as Members that drove this ethics reform process.

Comments of Rep. Martin, 135 Cong.Rec. H8747–48 (1989) (emphasis added). Similarly, Rep. Weiss stated that, "Perhaps the single most important part of this package is the ban on honoraria for *Members of the House.*" Comments of Rep. Weiss, 135 Cong.Rec. H8767 (Nov. 16, 1989) (emphasis added).

the United States government alleged or believed to be in violation thereof; and it is

FURTHER ORDERED, that this judgment, and the permanent injunction entered hereby, are stayed pending completion of proceedings on any timely appeal taken herefrom.[15]

---

**15.** The Court was informed by the parties on December 4, 1991, that legislation was introduced in the House of Representatives as H.R. 3341, and passed by that chamber on November 25, 1991, purporting to amend Section 501(b) to eliminate the honoraria ban for federal employees if the speech, article or appearance for which they are paid, and the payment itself, are unrelated to the employees' official duties or status.

The Court was also informed that H.R. 3341 was prevented of consideration by the Senate by the objection of a single U.S. Senator, as the Senate rules permit him to do. Consequently, the first session of the 102d Congress adjourned November 27, 1991, without enacting legislation correcting the constitutional infirmities of Section 501(b).