# Legality of Government Honoraria Ban Following U.S. v. National Treasury Employees Union

No portion of § 501(b) of the Ethics in Government Act of 1978, which imposes an honoraria ban on all government employees, survives the Supreme Court's decision in *United States v. National Treasury Employees Union.*

February 26, 1996

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

Last year, the Supreme Court held that section 501(b) of the Ethics in Government Act of 1978 — which imposes a government-wide ban on the receipt of honoraria by any government employee — violates the First Amendment. *United States v. National Treasury Employees Union,* 513 U.S. 454, 477 (1995) (*"NTEU"*). This memorandum examines, at the request of the Civil Division, the question what, if any, portion of section 501(b) survives the *NTEU* decision. As explained more fully below, we conclude that the answer to this question must be "none." Following the Supreme Court's invalidation of section 501(b) with respect to the vast majority of the statute's targeted audience, what remains is a very different statute from the one Congress enacted. We cannot know, nor should we speculate, whether Congress would have enacted an honoraria ban as limited in scope as that portion of section 501(b) which the Supreme Court declined to strike down. The special constitutional solicitude accorded First Amendment rights, moreover, cautions against any intrusion upon those rights without the prior reflective judgment of the legislature.

## I.

In 1989, Congress enacted the Ethics Reform Act (the "Act"), Pub. L. No. 101–194, 103 Stat. 1716, 5 U.S.C. app. §§ 101–505, in an effort to reinforce standards of integrity within the federal government. Concluding that "substantial outside earned income creates at least the appearance of impropriety and thereby undermines public confidence in the integrity of government officials," Report of Bipartisan Task Force on Ethics on H.R. 3660, *reprinted at* 135 Cong. Rec. 30,740, 30,744 (1989) ("Bipartisan Task Force Report"), Congress amended section 501(b) of the Ethics in Government Act of 1978 to create the following "Honoraria Prohibition": "An individual may not receive any honorarium while that individual is a Member, officer, or employee." 5 U.S.C. app. § 501(b). The Act broadly defines "officer or employee" to include nearly all employees of the federal government. An "honorarium" is defined as "a payment of money

78

or any thing of value for an appearance, speech or article." [1] *Id.* § 505(3). Federal employees are thus prohibited from receiving compensation for a wide variety of expressive activities, whether or not these are related to their official duties.

Various individuals challenged the constitutionality of the honoraria ban in federal district court and their cases were consolidated into a single class action. The class was defined as "all Executive Branch employees 'below grade GS–16, who—but for 5 U.S.C. app. 501(b)—would receive honoraria.'" *NTEU*, 513 U.S. at 461. The district court granted the employees' motion for summary judgment, holding the statute "unconstitutional insofar as it applies to Executive Branch employees of the United States government"; it enjoined enforcement of the statute against any executive branch employee. *NTEU*, 788 F. Supp. 4, 13 (D.D.C. 1992). On appeal, the Court of Appeals affirmed, concluding that the government's concededly strong interest in protecting the integrity and efficiency of public service did not justify a substantial burden on speech which did not advance that interest. Determining that § 501(b)'s application to executive branch employees was severable, the Court of Appeals effectively rewrote the statute by striking the words "'officer or employee' from section 501(b), *except* in so far as those terms encompass members of Congress, officers and employees of Congress, judicial officers and judicial employees." *NTEU*, 990 F.2d 1271, 1279 (D.C. Cir. 1993) (emphasis added).

By a vote of 6 to 3, the Supreme Court, in an opinion written by Justice Stevens, affirmed in part and reversed in part. The Court began its analysis with the affirmation that, even though respondent employees work for the federal government, "they have not relinquished 'the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest.'" *NTEU*, 513 U.S. at 465 (citing *Pickering v. Board of Educ. of Township High School Dist.*, 391 U.S. 563, 568 (1968)). Because respondents' expressive activities fell "within the protected category of citizen comment on matters of public concern," *id.* at 466, the Court applied *Pickering*'s familiar balancing test:

> When a court is required to determine the validity of such a restraint [on speech], it must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*Id.* at 465–66 (citing *Pickering*, 391 U.S. at 568).

---

[1] A 1991 amendment to the definition of "honorarium" provides one example of some of the unusual distinctions made by the statute. Under the amended definition, which refers to "a series of appearances speeches, or articles," pay is prohibited for a *series* of articles only if a nexus exists between the author's employment and either the subject matter of the expression or the identity of the payor. *Id.* However, for an *individual* article or speech, pay is prohibited regardless of any such nexus.

Looking more closely at the far-reaching scope of the honoraria ban, the Court was clearly concerned with its widespread impact: It alternately characterized § 501(b) as a "wholesale deterrent to a broad category of expression by a massive number of potential speakers," *id*. at 454, "a sweeping statutory impediment to speech," which "chills potential speech before it happens," *id*. at 467, 468, a "large-scale disincentive to Government employees' expression," *id*. at 470, and a "crudely crafted burden on respondents' freedom to engage in expressive activities." *Id*. at 477. The heavy burden that the government bore in justifying the ban was not, the Court concluded, satisfied by the government's concerns about the potential for honoraria abuses and the need "to protect the efficiency of the public service." *Id*. at 474. These concerns were neither sustained by the record, which was devoid of evidence of honoraria misconduct by the vast rank and file of federal employees, nor supported by the text of the statute. The Court thus held that § 501(b) violated the First Amendment. *Id*. at 477.

Although it affirmed the D.C. Circuit's holding with respect to the invalidity of the honoraria ban, the Court rejected the lower court's "overinclusive" remedy. Instead, it granted full relief to respondents, enjoining enforcement of the ban as to "all Executive Branch employees below Grade GS–16," *id*. at 478, but refusing to decide the applicability of the ban to senior executive branch officials.[2] The Court noted that "the Government conceivably might advance a different justification for an honoraria ban limited to more senior officials, thus presenting a different constitutional question than the one we decide today." *Id*. Its "obligation to avoid judicial legislation" also prevented the Court from crafting a nexus requirement for the honoraria ban. How the ban should be limited — whether to cases involving an undesirable nexus between the speaker's official duties and the subject matter of the speaker's expression or to those involving some nexus to the identity of the payor — was not, the Court said, a matter for judicial determination. Rather, the task of drafting a narrower statute was properly left to Congress. *Id*. at 479.

In a separate concurrence, Justice O'Connor made clear her understanding that the majority's holding did not require invalidation of the entire statute. She argued that the statute was still "capable of functioning independently" with respect to its "principal targets" — high-level executive branch employees and employees of the legislative and judicial branches. *Id*. at 489 (O'Connor, J., concurring). Justice O'Connor would also have read a nexus requirement into the honoraria ban.

Dissenting Chief Justice Rehnquist, joined by Justices Scalia and Thomas, insisted that the honoraria ban was consistent with the First Amendment under the *Pickering* test. *Id*. at 501. Chief Justice Rehnquist noted that even if he agreed with the majority's conclusion that the ban violated the First Amendment, he

---

[2] The Court recognized that the class of respondents included one GS–16 employee to whom "[t]he rationale we have set forth for our holding does not necessarily apply." Noting, however, that the government did not request reversal of the lower court's judgment granting him relief, the Court left that part of the lower court's judgment intact. *Id*. at 478 n.23.

would not accept the majority's failure to include a nexus requirement in its remedy. Because the majority had limited its analysis "to only those applications of the honoraria ban where there is no nexus between the honoraria and Government employment," in the Chief Justice's view, the Court properly should have limited its remedy to such applications as well.[3] *Id.* at 502. Thus, like Justice O'Connor, the dissent would have "affirmed the injunction against the enforcement of § 501(b) as applied to Executive Branch employees below grade GS–16 who seek honoraria that are unrelated to their Government employment." *Id.* at 503.

## II.

Our analysis of *NTEU* begins with its holding: as written, the honoraria ban of § 501(b) violates the First Amendment. While § 501(b) does not directly abridge speech or discriminate among speakers on the basis of the content or viewpoint of their messages, its prohibition on compensation "unquestionably imposes a significant burden on expressive activity." *NTEU*, 513 U.S. at 468. Whatever "speculative benefits," *id.* at 477, the honoraria ban may provide the government are insufficient to justify this "blanket burden on the speech of nearly 1.7 million federal employees." *Id.* at 474.

Finding § 501(b) to be an invalid abridgment of government employees' First Amendment rights, the Supreme Court explicitly prohibited its enforcement against the class of employees represented by the *NTEU* plaintiffs, *i.e.*, all executive branch employees below grade GS–16. That group, the Court recognized, consists of "an immense class of workers." *Id.* at 473. By enjoining application of the honoraria ban with respect to this class, the Court drastically curtailed the scope that even arguably could be given to § 501(b).

The question is whether any remaining applications of § 501(b) — for example, to employees of the legislative and judicial branches and to high-level executive officials — survive the *NTEU* decision. Under well-established canons of statutory construction, a portion of a statute that has been held invalid may be severed, leaving the rest to operate, if there is no evidence that the legislature considered the valid and invalid portions to be "conditions, considerations, or compensations for each other." 2 Norman J. Singer, Sutherland Statutory Construction § 44.06 (5th ed. 1992). Only if severance of the invalid provision would result in the creation of a law that the legislature would not have enacted, should the entire statute be invalidated. *Id.* § 44.04. "The final test [of severability] . . . is the traditional one: the unconstitutional provision must be severed unless the statute

---

[3] In a footnote, Chief Justice Rehnquist made clear that he "certainly could not condemn the Court for its refusal to rewrite the statute," but was simply challenging "the Court's failure to tailor its remedy to match its selective analysis." *Id.* at 502 n.8.

created in its absence is legislation that Congress would not have enacted." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987).

However, the courts' " 'duty . . . to maintain [a challenged] act in so far as it is valid,' " *id.* at 684 (citation omitted), is not unlimited. Three considerations lead us to the conclusion that an attempt to apply § 501(b) to anyone after *NTEU* would run afoul of the courts' "obligation to avoid judicial legislation." *NTEU*, 513 U.S. at 479.

1. As noted in *NTEU* itself, attempts to devise a constitutional construction of a partially invalid statute are deeply problematic if they require the courts "to tamper with the text of the statute, a practice we strive to avoid." *Id.* at 478. This principle has special force when a proposed "construction" would essentially redraft the statute by treating general language as if it contained words limiting the statute's scope. *See, e.g., Eubanks v. Wilkinson*, 937 F.2d 1118, 1125 (6th Cir. 1991). Even in the presence of a severability clause making explicit the congressional intention that a partly invalid statute should be upheld to the greatest extent possible, the Supreme Court has held that it could not "dissect an unconstitutional measure and reframe a valid one out of it by inserting limitations it does not contain." *Hill v. Wallace*, 259 U.S. 44, 70 (1922). Doing so would run the risk of "creat[ing] a program quite different from the one the legislature actually adopted," *Sloan v. Lemon*, 413 U.S. 825, 834 (1973), a danger that the *NTEU* Court explicitly cited in refusing to adopt the government's proposal to insert a nexus requirement into § 501(b)'s honoraria ban. 513 U.S. at 479.

We believe that any attempt to identify a surviving core to § 501(b) runs afoul of this principle, because what would be left is an entirely different statute from the one Congress intended to enact. While the absence of a severability clause from the Act does not in itself create a presumption against severability, *Alaska Airlines*, 480 U.S. at 686, nothing in the text or legislative history of the honoraria ban indicates that Congress was willing to limit the ban to high-level executive branch officials and legislative and judicial branch employees. The primary focus of the legislative history, as both the district court and the Court of Appeals recognized, was Congress' concern with the receipt of honoraria by its own members. *NTEU*, 788 F. Supp. at 13; *NTEU*, 990 F.2d at 1278. There is no evidence, however, that this was Congress' *exclusive* concern. While the discussion in the Bipartisan Task Force Report concentrates on potential honoraria abuses by Congress, the report nevertheless recommends "that honoraria be abolished *for all officers and employees of the government.*" Bipartisan Task Force Report, 135 Cong. Rec. at 30,744 (emphasis added). Some of the language in the Senate floor debate suggests that a general honoraria ban was the "heart" of the proposed legislation. *See* 135 Cong. Rec. at 29,660–61 (comments of Sen. Mitchell). Moreover, notwithstanding any preoccupation in the legislative history with an honoraria ban directed at Congress, the fact remains that the ban which Congress eventually *did* enact was not limited to its own members, but extended to a broad class

of government employees in coordinate branches.[4] Any saving "construction" of § 501(b) would unavoidably upset the decision Congress actually made to enact a honoraria ban extending across all three branches, and would require the courts to speculate as to which of the several possible narrower statutes — if any — Congress would have enacted if it had foreseen the decision in *NTEU*.

2. A decision upholding as still valid some applications of § 501(b) would not only create a provision the scope of which was the product of judicial, not legislative, creativity; it would also approve a regulatory scheme of vastly different practical proportions than the one that Congress envisioned when it enacted the statute. The honoraria ban that Congress understood itself to be enacting covered a very large number of persons, while any saving construction would reduce the group affected manyfold. Whatever the significance of attempting to reach the larger class for First Amendment analysis, Congress might reasonably have considered a broader approach more politically acceptable or even responsible. *Cf. United States v. Carolene Products Co.*, 304 U.S. 144 (1938). The drastic reduction in the practical reach of the statute required after *NTEU* in itself suggests that the resulting honoraria ban is not one that is traceable to congressional intent. As the Supreme Court has noted, the general presumption in favor of statutory validity "may disappear where the statute in question has already been declared unconstitutional in the vast majority of its intended applications, and it can fairly be said that it was not intended to stand as valid . . . only in a fraction of the cases it was originally designed to cover." *United States v. Raines*, 362 U.S. 17, 23 (1960); *Adams v. Askew*, 511 F.2d 700, 704 (5th Cir. 1975). Precisely such a situation is presented here. The *NTEU* decision invalidated § 501(b) with respect to the vast majority of the applications Congress intended it to have. What we are left with is an entirely different statute from the one that Congress enacted.

3. The need to exercise caution and restraint in evaluating congressional intent is particularly acute where, as here, First Amendment rights are implicated. We hold no freedom more inviolable than our First Amendment right to freedom of speech. Because free and unfettered debate lies at the foundation of our republic, First Amendment rights "hold a preferred position in the hierarchy of the constitutional guarantees of the incidents of freedom." *Poulos v. New Hampshire*, 345 U.S. 395, 405 (1953).

Given the special constitutional solicitude granted First Amendment rights, a federal statute will ordinarily not be construed to infringe upon those rights absent a clear and affirmative expression of congressional intent. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 504 (1979). While we may be able to speculate from the legislative history that Congress might have enacted an honoraria ban

---

[4] We note that, were we to agree that the legislative history's focus on the receipt of honoraria by members of Congress was dispositive of the question of congressional intent, such a position could, at most, support application of the statute to members of Congress, not to other legislative, judicial or executive branch employees. Justice O'Connor, who urged this application in her concurrence, cited no legislative history to support such an expansion. Rather, the legislative history she relied upon referred, again, only to members of Congress.

more limited than § 501(b), we cannot say with certainty that Congress would have done so, nor can we know what limitations Congress might have imposed or what rationale Congress might have offered. In *NTEU*, the Court refused to draw a line between "categories of speech covered by [the] overly broad statute, [where] Congress has sent inconsistent signals as to where the new line or lines should be drawn." 513 U.S. at 479 n.26. A judicial decision choosing where to draw the line between categories of speakers covered by the honoraria ban would be a similar and equally unacceptable "invasion of the legislative domain." *Id.* In the absence of any clear legislative intent to restrict application of the honoraria ban to high-level executive officials, and employees of the legislative and judicial branches, § 501(b) simply cannot stand.

## III.

After *NTEU*, there can be no doubt that the honoraria ban imposes a significant burden on the First Amendment rights of federal government employees. Government protestations of possible honoraria abuses and administrative inefficiencies notwithstanding, the Supreme Court effectively eviscerated § 501(b) by prohibiting its application to executive branch employees below GS–16. Whether Congress would have enacted an honoraria ban limited to those government employees not included within the *NTEU* class is an open question. Certainly these remaining employees have First Amendment rights no less compelling than those of the *NTEU* class members, rights which cannot and should not be summarily abridged on the basis of speculation as to congressional intent. We thus conclude that § 501(b) does not survive the Supreme Court's ruling in *NTEU*.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*