# UNITED STATES ET AL. *v.* NATIONAL TREASURY EMPLOYEES UNION ET AL.

No. 93–1170.   Argued November 8, 1994—Decided February 22, 1995

STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment in part and dissenting in part, *post*, p. 480. REHNQUIST, C. J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined, *post*, p. 489.

*Deputy Solicitor General Bender* argued the cause for the United States. With him on the briefs were *Solicitor General Days, Assistant Attorney General Hunger, Michael R. Dreeben, John C. Hoyle,* and *Alfred Mollin.*

*Gregory O'Duden* argued the cause for respondents. With him on the brief were *Elaine Kaplan, Barbara A. Atkin, Mark D. Roth, Anne Wagner, John Vanderstar, Steven R. Shapiro,* and *Arthur B. Spitzer.**

---

*\*Stephen F. Black* and *W. Hardy Callcott* filed a brief for Common Cause as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Freedom to Read Foundation et al. by *R. Bruce Rich, Paul M. Smith, Bruce J. Ennis, Jr., Julie M. Carpenter, Elliot M. Mincberg,* and *Lawrence S. Ottinger;* for Public Citizen, Inc., by *Alan B. Morrison;* for the Senior Executives Association by *George J. Shaw, Jr.,* and *William L. Bransford;* and for Peter Bollen by *Stephen S. Ostrach.*

JUSTICE STEVENS delivered the opinion of the Court.

In 1989 Congress enacted a law that broadly prohibits federal employees from accepting any compensation for making speeches or writing articles. The prohibition applies even when neither the subject of the speech or article nor the person or group paying for it has any connection with the employee's official duties. We must decide whether that statutory prohibition comports with the Constitution's command that "Congress shall make no law . . . abridging the freedom of speech." We hold that it does not.

I

In 1967 Congress authorized the appointment every four years of a special Commission on Executive, Legislative, and Judicial Salaries, whose principal function would be to recommend appropriate levels of compensation for the top positions in all three branches of the Federal Government. Each of the first five Quadrennial Commissions recommended significant salary increases, but those recommendations went largely ignored. The Report of the 1989 Quadrennial Commission, however, was instrumental in leading to the enactment of the Ethics Reform Act of 1989,[1] which contains the provision challenged in this case.

The 1989 Quadrennial Commission's report noted that inflation had decreased the salary levels for senior Government officials, measured in constant dollars, by approximately 35% since 1969. The report

> "also found that because their salaries are so inadequate, many members of Congress are supplementing their official compensation by accepting substantial amounts of

---

[1] 103 Stat. 1760, 5 U. S. C. App. § 101 et seq. (1988 ed., Supp. V). The 1989 statute is a comprehensive amendment of the Ethics in Government Act of 1978, 92 Stat. 1824. The provisions of the Act governing outside income, including honoraria, are codified at 5 U. S. C. App. § 501 et seq. (1988 ed., Supp. V).

'honoraria' for meeting with interest groups which desire to influence their votes. Albeit to a less troubling extent, the practice of accepting honoraria also extends to top officials of the Executive and Judicial branches." Fairness for Our Public Servants: Report of The 1989 Commission on Executive, Legislative and Judicial Salaries vi (Dec. 1988).

Accordingly, the Commission recommended that "salary levels for top officials be set at approximately the same amount in constant dollars" as those in effect in 1969 and further that "Congress enact legislation abolishing the practice of accepting honoraria in all three branches." *Ibid.*

The President's Commission on Federal Ethics Law Reform subsequently issued a report that endorsed the Quadrennial Commission's views. The President's Commission recommended enacting a ban on receipt of honoraria "by all officials and employees in all three branches of government." To Serve With Honor: Report of the President's Commission on Federal Ethics Law Reform 36 (Mar. 1989). Explaining the breadth of its proposal, it added:

"In recommending this ban, we also recognize, as did the Quadrennial Commission, that the statutory definition of honoraria must be broad enough to— 'close present and potential loopholes such as receipt of consulting, professional or similar fees; payments for serving on boards; travel; sport, or other entertainment expenses not reasonably necessary for the appearance involved; or any other benefit that is the substantial equivalent of an honorarium.'" *Ibid.* (quoting Fairness for Our Public Servants, at 24).

Although not adopted in their entirety, the two Commissions' recommendations echo prominently in the Ethics Reform Act of 1989. Section 703 of that Act provided a 25% pay increase to Members of Congress, federal judges, and

certain high-level Executive Branch employees above the salary grade GS–15.[2]  See 103 Stat. 1768.  Another section—the one at issue here—amended § 501(b) of the Ethics in Government Act of 1978 to create an "Honoraria Prohibition," which reads: "An individual may not receive any honorarium while that individual is a Member, officer or employee."  *Id.*, at 1760.

Section 505 of the Ethics Reform Act defined "officer or employee" to include nearly all employees of the Federal Government and "Member" to include any Representative, Delegate, or Resident Commissioner to Congress.  The Congressional Operations Appropriations Act, 1992, adopted in 1991,[3] extended both the salary increase and the prohibition against honoraria to the Senate.  The 1989 Act defined "honorarium" to encompass any compensation paid to a Government employee for "an appearance, speech or article."[4]  The 1992 Appropriations Act amended that definition to exclude any *series* of appearances, speeches, or articles unrelated to the employee's official duties or status.  The definition now reads as follows:

"(3) The term 'honorarium' means a payment of money or any thing of value for an appearance, speech

---

[2] The General Schedule, abbreviated "GS," is the basic pay schedule for employees of the Federal Government.  5 U. S. C. § 5332 (1988 ed. and Supp. V).  The Executive Branch positions to which the statute gave the salary increase are on the Executive Schedule, a separate pay scale above the General Schedule.  See 103 Stat. 1768.

[3] 105 Stat. 447, 5 U. S. C. § 5318 note (1988 ed., Supp. V).

[4] The original definition read as follows: "(3) The term 'honorarium' means a payment of money or any thing of value for an appearance, speech or article by a Member, officer or employee, excluding any actual and necessary travel expenses incurred by such individual (and one relative) to the extent that such expenses are paid or reimbursed by any other person, and the amount otherwise determined shall be reduced by the amount of any such expenses to the extent that such expenses are not paid or reimbursed."  103 Stat. 1761, 1762.

or article (including a series of appearances, speeches, or articles if the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government) by a Member, officer or employee, excluding any actual and necessary travel expenses incurred by such individual (and one relative) to the extent that such expenses are paid or reimbursed by any other person, and the amount otherwise determined shall be reduced by the amount of any such expenses to the extent that such expenses are not paid or reimbursed." 5 U. S. C. App. § 505(3) (1988 ed., Supp. V).

Section 503(2) of the Ethics Reform Act provides that the statutory provisions governing honoraria for employees of the Executive Branch shall be subject to rules and regulations issued by the Office of Government Ethics (OGE) and administered by designated agency ethics officials. 5 CFR § 2636.201 *et seq.* (1994). OGE's regulations permit reimbursement of certain expenses associated with appearances, speeches, and articles. The regulations also confine the reach of each of those terms. Thus, a performance using "an artistic, athletic or other such skill or talent" is not an "appearance"; reading a part in a play or delivering a sermon is not a "speech"; and works of "fiction, poetry, lyrics, or script" are not "article[s]." §§ 2636.203(b), (d). The regulations permit teaching a course involving multiple presentations at an accredited program or institution.

The Attorney General may enforce the prohibition against honoraria by a civil action to recover a penalty of not more than the larger of $10,000 or the amount of the honorarium. If an employee has accepted an honorarium in good-faith reliance on an opinion of either the OGE or the ethics officer of her employing agency, she is not subject to the civil penalty. 5 U. S. C. App. § 504 (1988 ed., Supp. V).

## II

Two unions and several career civil servants employed full time by various Executive departments and agencies filed suit in the United States District Court for the District of Columbia to challenge the constitutionality of the honoraria ban. Pursuant to a stipulation with the Government, the District Court certified respondent National Treasury Employees Union as the representative of a class composed of all Executive Branch employees "below grade GS–16, who— but for 5 U. S. C. app. 501(b)—would receive 'honoraria,' as defined in 5 U. S. C. app. 505(3)." App. 124–125.[5] All of the individual respondents save one are members of the class; the exception is a grade GS–16 lawyer for the Nuclear Regulatory Commission who has published articles about Russian history.

Each of the individual respondents alleges that he or she has in the past received compensation for writing or speaking on various topics in full compliance with earlier ethics regulations. The record contains a number of affidavits describing respondents' past activities that the honoraria ban would now prohibit. A mail handler employed by the Postal Service in Arlington, Virginia, had given lectures on the Quaker religion for which he received small payments that were "not much, but enough to supplement my income in a way that makes a difference." *Id.*, at 47. An aerospace engineer employed at the Goddard Space Flight Center in Greenbelt, Maryland, had lectured on black history for a fee of $100 per lecture. *Id.*, at 63. A microbiologist at the Food and Drug Administration had earned almost $3,000 per year writing articles and making radio and television appearances reviewing dance performances. *Id.*, at 77. A tax examiner

---

[5] In 1993, employees in the certified class earned between $11,903 (GS–1, step 1) and $86,589 (GS–15, step 10). 5 U. S. C. § 5332 (1988 ed., Supp. V). According to OPM, the mean grade was GS–9, which paid workers between $27,789 and $36,123. Office of Personnel Management, Demographic Profile of the Federal Workforce, App. 2, p. 79 (Sept. 1992).

employed by the Internal Revenue Service in Ogden, Utah, had received comparable pay for articles about the environment. *Id.*, at 67.

The District Court granted respondents' motion for summary judgment, held the statute "unconstitutional insofar as it applies to Executive Branch employees of the United States government," and enjoined the Government from enforcing the statute against any Executive Branch employee. 788 F. Supp. 4, 13–14 (1992). The court acknowledged that Congress' interest in promoting "the integrity of, and popular confidence in and respect for, the federal government" is "vital." *Id.*, at 9. The court also characterized § 501(b) as a content-neutral restriction on the speech of "government employees who, as a condition of their employment, have relinquished certain First Amendment prerogatives . . . ." *Id.*, at 10. Nevertheless, the court concluded that "regulatory legislation having the effect of suppressing freedom of expression to the slightest degree" could "go no farther than necessary to accomplish its objective." *Ibid.* The court found the statute both overinclusive, because it restricts so much speech, and underinclusive, because it prohibits honoraria for some forms of speech and not others. *Id.*, at 11. Concluding from the legislative history that Congress had been concerned mainly about appearances of impropriety among its own Members, the court found the application of § 501(b) to the parties before it severable from the remainder of the Act.

The Court of Appeals affirmed. 990 F. 2d 1271 (CADC 1993). It noted that, even though § 501(b) prohibits no speech, the denial of compensation places a significant burden on employees. The court held that the Government's strong, undisputed interest "in protecting the integrity and efficiency of public service and in avoiding even the appearance of impropriety created by abuse of the practice of receiving honoraria" does not justify a substantial burden on speech that does not advance that interest. *Id.*, at 1274. The court emphasized that the Government's failure as to

many respondents to identify "some sort of nexus between the employee's job and either the subject matter of the expression or the character of the payor" undercut its proffered concern about actual or apparent improprieties. *Id.,* at 1275.[6] Stressing the absence of evidence of either corruption or the appearance of corruption among lower level federal employees receiving honoraria with no connection to their employment, the Court of Appeals concluded that the Government had failed to justify the ban's burden on their speech. *Id.,* at 1277. The court rejected the Government's argument that administrative and enforcement difficulties justify § 501(b)'s broad prophylactic rule.[7]

---

[6] The Court of Appeals acknowledged that "even some of the plaintiffs receive payments that might at least raise an eyebrow," citing a business editor for the Voice of America who received payment for business analysis and a GS–7 "tax examining assistant" as to whom payment of any honorarium might raise some concern "[i]n view of the universality of citizens' subjection to the Internal Revenue Service." 990 F. 2d, at 1275–1276. Another plaintiff whose expressive activities appear to come within a nexus to Government employment is the Treasury Employees' Union itself, which complains that the honoraria ban has hindered publication of its chapters' newsletters. App. 58–62.

[7] "As summarized in testimony before the Senate Committee on Governmental Affairs, the prior regulations allowed honoraria so long as the speaker or writer held a rank lower than GS–16 and all of the following questions could be answered negatively:

"(1) Is the honorarium offered for carrying out government duties or for an activity that focuses specifically on the employing agency's responsibilities, policies and programs?

"(2) Is the honorarium offered to the government employee or family member because of the official position held by the employee?

"(3) Is the honorarium offered because of the government information that is being imparted?

"(4) Is the honorarium offered by someone who does business with or wishes to do business with the employee in his or her official capacity?

"(5) Were any government resources or time used by the employee to produce the materials for the article or speech or make the appearance?

"S. Rep. No. 29, 102d Cong., 1st Sess., at 8 (1991). While some of the limits may have an amorphous quality about them (such as the one purporting to probe the motive of the honorarium's offeror), there appears no

Turning to the question of remedy, the Court of Appeals agreed with the District Court that §501(b)'s application to Executive Branch employees is severable from the remainder of the statute. The legislative history convinced the court that Congress had adopted the honoraria ban primarily in response to the growing concern about payments to its own Members; moreover, the statute itself disclosed that "the honorarium ban was adopted as part of a package of which a key ingredient was a sharp increase in the salary of members of Congress, judges, and a limited class of senior executive branch officials." *Id.*, at 1278 (citation omitted). Accordingly, the court fashioned a remedy that, in effect, rewrote the statute by eliminating the words "officer or employee" from §501(b) *"except* in so far as those terms encompass members of Congress, officers and employees of Congress, judicial officers and judicial employees." *Id.*, at 1279.[8]

Over two dissents, the Court of Appeals denied a petition for rehearing en banc. 3 F. 3d 1555 (1993). We granted certiorari. 511 U. S. 1029 (1994).

## III

Federal employees who write for publication in their spare time have made significant contributions to the marketplace of ideas. They include literary giants like Nathaniel Hawthorne and Herman Melville, who were employed by the Customs Service; Walt Whitman, who worked for the De-

---

actual experience of difficulty, and one can hypothesize rules of thumb that could constrain government discretion." 990 F. 2d, at 1276–1277.

[8] In dissent, Judge Sentelle maintained that the statute was constitutional. He also objected to the court's remedy. In his opinion, the majority's severance of the statutory provisions relating to the Executive Branch was "nothing less than judicial legislation," 990 F. 2d, at 1296 (citation and internal quotation marks omitted), and its reluctance to invalidate the honoraria ban as to Members of Congress would have been "better served by striking the statute down as applied" to the plaintiff class. *Id.*, at 1298.

partments of Justice and Interior; and Bret Harte, an employee of the mint.[9]   Respondents have yet to make comparable contributions to American culture, but they share with these great artists important characteristics that are relevant to the issue we confront.

Even though respondents work for the Government, they have not relinquished "the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (1968). They seek compensation for their expressive activities in their capacity as citizens, not as Government employees. They claim their employment status has no more bearing on the quality or market value of their literary output than it did on that of Hawthorne or Melville.   With few exceptions, the content of respondents' messages has nothing to do with their jobs and does not even arguably have any adverse impact on the efficiency of the offices in which they work. They do not address audiences composed of co-workers or supervisors; instead, they write or speak for segments of the general public.   Neither the character of the authors, the subject matter of their expression, the effect of the content of their expression on their official duties, nor the kind of audiences they address has any relevance to their employment.

In *Pickering* and a number of other cases we have recognized that Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large.   See, *e. g., Snepp* v. *United States*, 444 U. S. 507 (1980).   When a court is required to determine the validity of such a restraint, it must "arrive at a balance between the interests of the [employee],

---

[9] See A. Turner, Nathaniel Hawthorne: A Biography 170–187 (1980); N. Arvin, Herman Melville 259–260 (1950); G. Allen, The Solitary Singer: A Critical Biography of Walt Whitman 319–321, 408 (1985); H. Merwin, The Life of Bret Harte 33–34 (1911).

as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U. S., at 568.

In such cases, which usually have involved disciplinary actions taken in response to a government employee's speech, we have applied *Pickering*'s balancing test only when the employee spoke "*as a citizen* upon matters of public concern" rather than "*as an employee* upon matters only of personal interest." *Connick* v. *Myers*, 461 U. S. 138, 147 (1983) (emphasis added). Thus, private speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer. *Id.*, at 148–149. If, however, the speech does involve a matter of public concern, the government bears the burden of justifying its adverse employment action. *Rankin* v. *McPherson*, 483 U. S. 378, 388 (1987);[10] see also *Waters* v. *Churchill*, 511 U. S. 661, 674 (1994). Respondents' expressive activities in this case fall within the protected category of citizen comment on matters of public concern rather than employee comment on matters related to personal status in the workplace. The speeches and articles for which they received compensation in the past were addressed to a public audience, were made outside the workplace, and involved content largely unrelated to their Government employment.

The sweep of § 501(b) makes the Government's burden heavy. Unlike *Pickering* and its progeny, this case does not

---

[10] *Rankin* is the only case in which we directly applied the *Pickering* balance to speech whose content had nothing to do with the workplace. The employee in that case was fired based on a statement in the workplace about an assassination attempt on the President. Satisfied that the statement was not a threat to kill the President, which the First Amendment would not have protected, we concluded that the statement involved a matter of public concern and that the firing violated the First Amendment. 483 U. S., at 386–387, 392.

involve a *post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities. Cf. *Waters* v. *Churchill*, 511 U. S. 661 (1994); *Rankin* v. *McPherson*, 483 U. S. 378 (1987); *Connick* v. *Myers*, 461 U. S. 138 (1983); *Perry* v. *Sindermann*, 408 U. S. 593 (1972). Rather, the Government asks us to apply *Pickering* to Congress' wholesale deterrent to a broad category of expression by a massive number of potential speakers.[11] In *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 564 (1973), we established that the Government must be able to satisfy a balancing test of the *Pickering* form to maintain a statutory restriction on employee speech. Because the discussion in that case essentially restated in balancing terms our approval of the Hatch Act in *Public Workers* v. *Mitchell*, 330 U. S. 75 (1947), we did not determine how the components of the *Pickering* balance should be analyzed in the context of a sweeping statutory impediment to speech.[12]

---

[11] The dissent seems to regard the honoraria ban as less onerous than our applications of *Pickering* to the speech of individual employees because the ban "is unrelated to the message or the viewpoint expressed by the government employee." *Post*, at 500. Our *Pickering* cases only permit the Government to take adverse action based on employee speech that has adverse *effects* on "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U. S., at 568. That certain messages may be more likely than others to have such adverse effects does not render *Pickering*'s restriction on speech viewpoint based. Even a teacher's persistent advocacy *in favor of* the actions of the school board, cf. *ibid.*, or an employee's exhortation *against* an attempt on the President's life, cf. *Rankin* v. *McPherson*, 483 U. S. 378 (1987), could provide proper grounds for adverse action if the government employer could demonstrate that such expression disrupted workplace efficiency. The honoraria ban as applied to respondents burdens speech far more than our past applications of *Pickering* because the ban deters an enormous quantity of speech before it is uttered, based only on speculation that the speech might threaten the Government's interests.

[12] Two decades ago, a three-Justice plurality invoked *Pickering* in the course of upholding against vagueness and overbreadth challenges a provision of the Lloyd-La Follette Act, 5 U. S. C. § 7501(a) (1970 ed.), that allowed the discharge of certain federal employees "only for such cause as

We normally accord a stronger presumption of validity to a congressional judgment than to an individual executive's disciplinary action. See *Turner Broadcasting System, Inc. v. FCC*, 512 U. S. 622, 671, and n. 2 (1994) (STEVENS, J., concurring in part and concurring in judgment). The widespread impact of the honoraria ban, however, gives rise to far more serious concerns than could any single supervisory decision. See *City of Ladue* v. *Gilleo*, 512 U. S. 43, 54–55 (1994).[13] In addition, unlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens. Cf. *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931). For these reasons, the Government's burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action. The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the Government. *Pickering*, 391 U. S., at 571.

Although § 501(b) neither prohibits any speech nor discriminates among speakers based on the content or viewpoint of their messages, its prohibition on compensation unquestionably imposes a significant burden on expressive activity. See *Simon & Schuster, Inc.* v. *Members of N. Y.*

---

will promote the efficiency of the [civil] service." *Arnett* v. *Kennedy*, 416 U. S. 134, 160–161 (1974). The plaintiff in that case stood accused of several work-related misdeeds, including making false and defamatory statements against co-workers. The plurality characterized the employee's false accusation that his superiors had accepted a bribe as "not protected by the First Amendment." *Id.*, at 158–159. Thus, the *Arnett* plurality merely cited *Pickering* to support a general statute's *post hoc* application to a single employee's arguably unprotected speech.

[13] As of September 30, 1992, the Federal Government employed 1,680,516 workers between grades GS–1 and GS–15. Office of Personnel Management, Demographic Profile of the Federal Workforce, App. 2, p. 79 (Sept. 1992).

*State Crime Victims Bd.*, 502 U. S. 105 (1991); see also *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 227–231 (1987); *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575 (1983). Publishers compensate authors because compensation provides a significant incentive toward more expression.[14] By denying respondents that incentive, the honoraria ban induces them to curtail their expression if they wish to continue working for the Government.[15]

The ban imposes a far more significant burden on respondents than on the relatively small group of lawmakers whose past receipt of honoraria motivated its enactment. The absorbing and time-consuming responsibilities of legislators and policymaking executives leave them little opportunity for research or creative expression on subjects unrelated to their official responsibilities. Such officials often receive invitations to appear and talk about subjects related to their work because of their official identities. In contrast, invitations to rank-and-file employees usually depend only on the market value of their messages. The honoraria ban is unlikely to reduce significantly the number of appearances by high-ranking officials as long as travel expense reimbursement for the speaker and one relative is available as an alternative form of remuneration. See *supra*, at 460. In

---

[14] This proposition is self-evident even to those who do not fully accept Samuel Johnson's cynical comment: "'No man but a blockhead ever wrote, except for money.'" J. Boswell, Life of Samuel Johnson LL. D. 302 (R. Hutchins ed. 1952).

[15] Several respondents indicated that the ban would compel them to discontinue their previously compensated expressive activities. App. 46, 50–51, 55, 66, 69, 74. In at least one case, a newspaper refused to continue publishing a respondent's work if he could not accept pay for it. *Id.*, at 78. Despite the OGE regulations' provision for recovery of certain expenses related to expressive activity, see *supra*, at 460, several respondents also reported that the ban would prevent or complicate their recovering other necessary expenses, creating a further disincentive to speak and write. App. 45–46, 55–56, 65, 74–75, 81, 84, 88.

contrast, the denial of compensation for lower paid, nonpolicymaking employees will inevitably diminish their expressive output.

The large-scale disincentive to Government employees' expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said. See *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 756–757 (1976). We have no way to measure the true cost of that burden, but we cannot ignore the risk that it might deprive us of the work of a future Melville or Hawthorne.[16] The honoraria ban imposes the kind of burden that abridges speech under the First Amendment.

## IV

Because the vast majority of the speech at issue in this case does not involve the subject matter of Government employment and takes place outside the workplace, the Government is unable to justify § 501(b) on the grounds of immediate workplace disruption asserted in *Pickering* and the cases that followed it. Cf., *e. g.*, *Waters*, 511 U. S., at 664. Instead, the Government submits that the ban comports with the First Amendment because the prohibited honoraria were "reasonably deemed by Congress to interfere with the efficiency of the public service." *Public Workers* v. *Mitchell*, 330 U. S. 75, 101 (1947).

In *Mitchell* we upheld the prohibition of the Hatch Act, 5 U. S. C. § 7324(a)(2), on partisan political activity by all classified federal employees, including, for example, a skilled me-

---

[16] These authors' familiar masterworks would survive the honoraria ban as currently administered. Besides exempting all books, the OGE regulations protect fiction and poetry from the ban's coverage, see *infra*, at 476, although the statute's language is not so clear. But great artists deal in fact as well as fiction, and some deal in both. See, *e. g.*, Allen, The Solitary Singer, at 41–55 (discussing Walt Whitman's speeches and nonfiction newspaper writing).

chanic at the mint named Poole who had no policymaking authority. We explained that "[t]here are hundreds of thousands of United States employees with positions no more influential upon policy determination than that of Mr. Poole. Evidently what Congress feared was the cumulative effect on employee morale of political activity by all employees who could be induced to participate actively." 330 U. S., at 101. In *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548 (1973), we noted that enactment of the Hatch Act in 1939 reflected "the conviction that the rapidly expanding Government work force should not be employed to build a powerful, invincible, and perhaps corrupt political machine." *Id.*, at 565. An equally important concern was

> "to further serve the goal that employment and advancement in the Government service not depend on political performance, and at the same time to make sure that Government employees would be free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs." *Id.*, at 566.

Thus, the Hatch Act aimed to *protect* employees' rights, notably their right to free expression, rather than to restrict those rights.[17] Like the Hatch Act, the honoraria ban affects hundreds of thousands of federal employees. Unlike partisan political activity, however, honoraria hardly appear to threaten employees' morale or liberty. Moreover, Congress effectively designed the Hatch Act to combat demonstrated ill effects of Government employees' partisan political activities. In contrast, the Government has failed to show how it serves the interests it asserts by applying the honoraria ban to respondents.

---

[17] Cf. *Arnett*, 416 U. S., at 159 (Lloyd-La Follette Act's purpose was "to give myriad different federal employees performing widely disparate tasks a common standard of job protection").

The Government's underlying concern is that federal officers not misuse or appear to misuse power by accepting compensation for their unofficial and nonpolitical writing and speaking activities. This interest is undeniably powerful, but the Government cites no evidence of misconduct related to honoraria in the vast rank and file of federal employees below grade GS–16.[18]  Instead of a concern about the "cumulative effect" of a widespread practice that Congress deemed to "menace the integrity and the competency of the service," *Mitchell*, 330 U. S., at 103, the Government relies here on limited evidence of actual or apparent impropriety by legislators and high-level executives, together with the purported administrative costs of avoiding or detecting lower level employees' violations of established policies.

As both the District Court and the Court of Appeals noted, the Government has based its defense of the ban on abuses of honoraria by Members of Congress. 990 F. 2d, at

---

[18] The Government cites a report of the General Accounting Office (GAO) to support its assertion that the ban is necessary to prevent widespread improprieties. General Accounting Office, Report to the Chairman, Subcommittee on Federal Services, Post Office and Civil Service of the Senate Committee on Governmental Affairs, Employee Conduct Standards: Some Outside Activities Present Conflict-of-Interest Issues (Feb. 1992) (hereinafter GAO Report); see Brief for United States 22–23. The GAO Report found that ethics officials at several large agencies had approved 545 outside speaking activities between 1988 and 1990. GAO Report 8. Over one-third of the total approved activities dealt with subject matter, or involved duties, similar to the employees' Government work. *Id.*, at 58. The GAO Report's conclusions and recommendations dealt exclusively with the problems of outside activities "that were focused specifically on the agencies' responsibilities and/or related directly to the employees' duties." *Id.*, at 13–14. The GAO Report's examples of instances that gave rise to serious concerns about real or apparent impropriety were two cases in which high-level employees (a chemist and a physicist) engaged in consulting activities related to the subject matter of their jobs. *Id.*, at 10. Its 112 pages contain not one mention of any real or apparent impropriety related to a lower level employee or to any employee engaged in writing or speaking or in any conduct unrelated to his or her Government job.

1278; 788 F. Supp., at 13.[19]   Congress reasonably could assume that payments of honoraria to judges or high-ranking officials in the Executive Branch might generate a similar appearance of improper influence.   Congress could not, however, reasonably extend that assumption to all federal employees below grade GS–16, an immense class of workers with negligible power to confer favors on those who might pay to hear them speak or to read their articles.   A federal employee, such as a supervisor of mechanics at the mint, might impair efficiency and morale by using political criteria to judge the performance of his or her staff.   But one can envision scant harm, or appearance of harm, resulting from the same employee's accepting pay to lecture on the Quaker religion or to write dance reviews.

Although operational efficiency is undoubtedly a vital governmental interest, e. g., *Rankin*, 483 U. S., at 384, several features of the honoraria ban's text cast serious doubt on the Government's submission that Congress perceived honoraria as so threatening to the efficiency of the entire federal service as to render the ban a reasonable response to the threat.   Cf. *Waters*, 511 U. S., at 677–678.   The first is the rather strange parenthetical reference to "a series of appearances, speeches, or articles" that the 1991 amendment inserted in the definition of the term "honorarium."   The amended definition excludes such a series from the prohibited category unless "the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government."   See *supra*, at 460.   In other words, accepting pay for a *series* of articles is prohibited if, and only if, a nexus exists between the author's employment and either the subject matter of the expression or the iden-

---

[19] Portending this reliance, the primary discussion of honoraria in the 1989 Quadrennial Commission's Report appeared as a subtopic in the "Legislative Branch" section.   Fairness for Our Public Servants: The Report of The 1989 Commission on Executive, Legislative and Judicial Salaries 24 (Dec. 1988).

tity of the payor.   For an *individual* article or speech, in contrast, pay is taboo even if neither the subject matter nor the payor bears any relationship at all to the author's duties.

Congress' decision to provide a total exemption for all unrelated series of speeches undermines application of the ban to individual speeches and articles with no nexus to Government employment.   Absent such a nexus, no corrupt bargain or even appearance of impropriety appears likely.   The Government's only argument against a general nexus limitation is that a wholesale prophylactic rule is easier to enforce than one that requires individual nexus determinations.   See Brief for United States 21–23.   The nexus limitation for series, however, unambiguously reflects a congressional judgment that agency ethics officials and the OGE can enforce the statute when it includes a nexus test.   A blanket burden on the speech of nearly 1.7 million federal employees requires a much stronger justification than the Government's dubious claim of administrative convenience.

The definition's limitation of "honoraria" to expressive activities also undermines the Government's submission that the breadth of § 501 is reasonably necessary to protect the efficiency of the public service.   Both Commissions that recommended the ban stressed the importance of defining honoraria in a way that would close "potential loopholes such as receipt of consulting, professional or similar fees; payments for serving on boards; travel; sport, or other entertainment expenses not reasonably necessary for the appearance involved; or any other benefit that is the substantial equivalent of an honorarium."   See *supra,* at 458.   Those recommendations reflected a considered judgment that compensation for "an appearance, speech or article" poses no greater danger than compensation for other services that a Government employee might perform in his or her spare time.[20]   Congress,

---

[20] The Government relies heavily on the reports of both the Quadrennial Commission and the President's Commission in defending § 501(b).   See Brief for United States 3–5, 19–20.

however, chose to restrict only expressive activities. One might reasonably argue that expressive activities, because they occupy a favored position in the constitutional firmament, should be exempt from even a comprehensive ban on outside income. Imposing a greater burden on speech than on other off-duty activities assumed to pose the same threat to the efficiency of the federal service is, at best, anomalous.

The fact that § 501 singles out expressive activity for special regulation heightens the Government's burden of justification. See *Minneapolis Star*, 460 U. S., at 583. As we noted last Term when reviewing the Federal Communications Commission's must-carry rules for cable television systems, "[w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' . . . It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting System*, 512 U. S., at 664. That case dealt with a direct regulation of communication by private entities, but its logic applies as well to the special burden § 501 imposes on the expressive rights of the multitude of employees it reaches. As Justice Brandeis reminded us, a "reasonable" burden on expression requires a justification far stronger than mere speculation about serious harms. "Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women. . . . To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced." *Whitney* v. *California*, 274 U. S. 357, 376 (1927) (concurring opinion).[21]

---

[21] "[W]e have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." *Waters* v. *Churchill*, 511 U. S. 661, 673 (1994) (plurality opinion). However, the cases in which we have done so generally have in-

The Government has not persuaded us that § 501(b) is a reasonable response to the posited harms.

We also attach significance to the OGE regulations that limit the coverage of the statutory terms "appearance, speech or article." 5 CFR § 2636.203 (1994). The regulations exclude a wide variety of performances and writings that would normally appear to have no nexus with an employee's job, such as sermons, fictional writings, and athletic competitions, see *supra*, at 460, countermanding the Commissions' recommendation that an even more inclusive honoraria ban would be appropriate. See *supra*, at 458. The exclusions, of course, make the task of the OGE and agency ethics officials somewhat easier, but they "diminish the credibility of the Government's rationale" that paying lower level employees for speech entirely unrelated to their work jeopardizes the efficiency of the entire federal service. *City of Ladue*, 512 U. S., at 52. We recognize our obligation to defer to considered congressional judgments about matters such as appearances of impropriety, but on the record of this case we must attach greater weight to the powerful and realistic presumption that the federal work force consists of dedicated and honorable civil servants. The exclusions in the OGE regulations are more consistent with that presumption than

---

volved isolated instances of speech that had already happened. See, *e. g.*, *Connick* v. *Myers*, 461 U. S. 138, 151–152 (1983). We deferred to the Government's predictions in upholding the Hatch Act, see *Public Workers* v. *Mitchell*, 330 U. S. 75, 100–101 (1947), but that statute's employee-protective rationale provided much stronger justification for a proscriptive rule than does the Government's interest in workplace efficiency. See *supra*, at 470–471. Deferring to the Government's speculation about the pernicious effects of thousands of articles and speeches yet to be written or delivered would encroach unacceptably on the First Amendment's protections. Cf. *Federal Election Comm'n* v. *National Conservative Political Action Comm.*, 470 U. S. 480, 498 (1985) (statute restricting political contributions violated First Amendment where "exchange of political favors for uncoordinated expenditures remain[ed] a hypothetical possibility and nothing more").

with the honoraria ban's dubious application not merely to policymakers, whose loss of honoraria was offset by a salary increase, but to all Executive Branch employees below grade GS–16 as well.

These anomalies in the text of the statute and regulations underscore our conclusion: The speculative benefits the honoraria ban may provide the Government are not sufficient to justify this crudely crafted burden on respondents' freedom to engage in expressive activities. Section 501(b) violates the First Amendment.

## V

After holding § 501(b) invalid because it was not as carefully tailored as it should have been, the Court of Appeals approved a remedy that is itself arguably overinclusive. The relief granted by the District Court and upheld by the Court of Appeals enjoined enforcement of the entire honoraria ban as applied to the entire Executive Branch of the Government.[22] That injunction provides relief to senior executives who are not parties to this case. It also prohibits enforcement of the statute even when an obvious nexus exists between the employee's job and either the subject matter of his or her expression or the interest of the person paying for it. As an alternative to its request for outright reversal, the Government asks us to modify the judgment by upholding the statute as it applies, first, to employees not party to this action and, second, to situations in which a nexus is present.

For three reasons, we agree with the Government's first suggestion—that the relief should be limited to the parties before the Court. First, although the occasional case requires us to entertain a facial challenge in order to vindicate

---

[22] The Court of Appeals did not reach the ban's applications to employees of the Legislative and Judicial Branches because its analysis of the legislative history convinced it that, had Congress believed the ban unconstitutional as to the Executive Branch, it still would have applied the ban to the other branches. 990 F. 2d, at 1279.

a party's right not to be bound by an unconstitutional statute, see, *e. g., Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U. S. 947, 965–967, and n. 13 (1984), we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants. See *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 484–485 (1989). In this case, granting full relief to respondents— who include all Executive Branch employees below grade GS–16—does not require passing on the applicability of § 501(b) to Executive Branch employees above grade GS–15, including those high-level employees who received a 25% salary increase that offsets the honoraria ban's disincentive to speak and write. Second, the Government conceivably might advance a different justification for an honoraria ban limited to more senior officials, thus presenting a different constitutional question than the one we decide today.[23] Our policy of avoiding unnecessary adjudication of constitutional issues, see *Ashwander* v. *TVA*, 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring), therefore counsels against determining senior officials' rights in this case. Third, as the Court of Appeals recognized, its remedy required it to tamper with the text of the statute,[24] a practice we strive to avoid.

---

[23] The parties to whom the lower courts granted relief include a single GS–16 employee. See *supra*, at 461. The rationale we have set forth for our holding does not necessarily apply to him. However, the Government does not request, as part of its suggested alternative to outright reversal, that we reverse the Court of Appeals' judgment as to that one employee. Accordingly, we leave that part of the court's judgment intact.

[24] The Court of Appeals said: "We cannot, as a technical matter, achieve the intended severance simply by striking the words 'officer or employee' from § 501(b), as that would invalidate the ban beyond the executive branch. . . . However, given the far greater congressional interest in banning honoraria for the legislative and judicial branches, we think it a proper form of severance to strike 'officer or employee' from § 501(b) *except* in so far as those terms encompass members of Congress, officers and employees of Congress, judicial officers and judicial employees." 990 F. 2d, at 1279.

Our obligation to avoid judicial legislation also persuades us to reject the Government's second suggestion—that we modify the remedy by crafting a nexus requirement for the honoraria ban. We cannot be sure that our attempt to re-draft the statute to limit its coverage to cases involving an undesirable nexus between the speaker's official duties and either the subject matter of the speaker's expression or the identity of the payor would correctly identify the nexus Congress would have adopted in a more limited honoraria ban. We cannot know whether Congress accurately reflected its sense of an appropriate nexus in the terse, 33-word paren-thetical statement with which it exempted series of speeches and articles from the definition of honoraria in the 1992 amendment, see *supra*, at 460; in an elaborate, nearly 600-word provision with which it later exempted Department of Defense military school faculty and students from the ban;[25] or in neither. The process of drawing a proper nexus, even more than the defense of the statute's application to senior employees, would likely raise independent constitutional con-cerns whose adjudication is unnecessary to decide this case. Cf. *supra*, at 478. We believe the Court of Appeals properly left to Congress the task of drafting a narrower statute.[26]

---

[25] See § 542 of the National Defense Authorization Act for Fiscal Year 1993, 106 Stat. 2413–2414.

[26] The dissent condemns our refusal to rewrite the statute. *Post*, at 501–503. It notes that, when we considered a challenge to a federal statute that banned expressive displays in the Supreme Court building and on the public sidewalks around it, we had no difficulty striking down the statute only as it applied to the public sidewalks. See *United States* v. *Grace*, 461 U. S. 171, 180–183 (1983). Drawing a line between a building and sidewalks with which we are intimately familiar, based on settled First Amendment principles, see *id.*, at 180, is a relatively simple matter. In contrast, drawing one or more lines between categories of speech covered by an overly broad statute, when Congress has sent inconsistent signals as to where the new line or lines should be drawn, involves a far more serious invasion of the legislative domain.

Insofar as the judgment of the Court of Appeals affirms the injunction against enforcement of § 501(b) against respondents, it is affirmed; insofar as it grants relief to parties not before the Court, it is reversed. The case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring in the judgment in part and dissenting in part.

Although I agree that aspects of the honoraria ban run afoul of the First Amendment, I write separately for two reasons. First, I wish to emphasize my understanding of how our precedents, beginning with *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563 (1968), and culminating in its most recent application, *Waters* v. *Churchill*, 511 U. S. 661 (1994), direct the Court's conclusion. Second, I write to express my disagreement with the Court's remedy, which in my view paints with too broad a brush.

I

The time-tested *Pickering* balance, most recently applied in *Waters*, provides the governing framework for analysis of all manner of restrictions on speech by the government as employer. Under *Pickering*, the Court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U. S., at 568. In contrast to some of our prior decisions, this case presents no threshold question whether the speech is of public, or merely private, concern. Respondents challenge the ban as it applies to off-hour speech bearing no nexus to Government employment—speech that by definition does not relate to "internal office affairs" or the employee's status as an employee. Cf. *Connick* v. *Myers*, 461 U. S. 138, 149 (1983).

In setting out the employees' interests in this case, the Court draws a meaningful distinction between the *ex ante* prohibition of certain kinds of speech and the *ex post* punishment of discrete, unforeseeable disturbances. See *ante,* at 466–468. There is some force to the Court's observation, because *ex ante* rules, in contrast to *ex post* punishments, carry risks of overinclusiveness and underinclusiveness. Nevertheless, reliance on the *ex ante/ex post* distinction is not a substitute for the case-by-case application of *Pickering.* There are many circumstances in which the Government as employer is likely to prefer the codification of its policies as workplace rules (which, incidentally, provide notice to employees) to the ad hoc, on-the-job reactions that have been standard fare in many of our employment cases. In most such circumstances, the Government will be acting well within its bounds. I see little constitutional difference, for example, between a rule prohibiting employees from being "'rude to customers,'" see *Waters, supra,* at 673, and the upbraiding or sanctioning of an employee *post hoc* for isolated acts of impudence. To draw the line based on a distinction between *ex ante* rules and *ex post* punishments, in my view, overgeneralizes and threatens undue interference with "the government's mission as employer," 511 U. S., at 674.

Given the breadth and intrusiveness of the honoraria ban in this case, however, I agree with the Court that significant weight must be placed on the employees' side of the scale in the *Pickering* balance. We recognized in *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.,* 502 U. S. 105, 115 (1991), that the imposition of financial burdens may have a direct effect on incentives to speak. See also *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue,* 460 U. S. 575, 585 (1983) (observing that the threat of burdensome taxes "can operate as effectively as a censor to check critical comment"). Although the honoraria ban certainly does not curtail *all* of the non-work-related speech

of the nearly two million members of respondent class, it doubtless inhibits some speech on matters of substantial public interest. In my view, the impact of the honoraria ban upon this class of employees' interests in speaking out as citizens, rather than as employees, cannot be gainsaid.

The Government advances two categories of interests in support of the honoraria ban. First, the Government submits its interests in promoting the efficiency of public service and in avoiding the appearance of impropriety created by abuse of the practice of receiving honoraria. We have credited these objectives as both salutary and significant on several occasions. See, *e. g.*, *Federal Election Comm'n* v. *National Right to Work Comm.*, 459 U. S. 197, 210 (1982); *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 788, n. 26 (1978); *Buckley* v. *Valeo*, 424 U. S. 1, 26–29 (1976). Although they lend support to the Government's efforts to put a stop to honoraria paid for work-related speech, these interests have less force in justifying a ban that prohibits honoraria paid for speech on matters wholly unrelated to the workplace. Perhaps recognizing this, the Government maintains that it has an additional interest in resisting evasion of its rule and sparing administrative resources. According to the Government, apparently innocuous payments may be made for illicit purposes, and the difficulty inherent in distinguishing the innocuous from the illicit mandates a broad prophylactic ban.

Balancing is difficult to undertake unless one side of the scale is relatively insubstantial. The Government argues that the Court should defer broadly to its determination that the benefits of the ban outweigh its costs. The Government relies on *Waters*, in which a plurality of the Court observed that "we have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." 511 U. S., at 673. But this principle has its limits, as the *Waters* plu-

rality went on to recognize. As the magnitude of intrusion on employees' interests rises, so does the Government's burden of justification. Cf. *Connick*, 461 U. S., at 150 ("[T]he State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression"); *id.*, at 151–152 (finding "a wide degree of deference" appropriate where employee's speech touched only peripherally on matters of public concern). Thus, in *Waters*, the plurality noted that "[i]n many such situations the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished." 511 U. S., at 674. This case presents one such situation.

The Court makes a persuasive case that the Government has made no such showing and that the Government's asserted interests are insufficiently weighty to justify a ban that curbs so much employee speech. See *ante*, at 470–477. In promulgating the ban, Congress relied on the reports of two blue-ribbon panels that suggested the prudence of a wide-ranging prohibition. Neither report noted any problems, anecdotal or otherwise, stemming from the receipt of honoraria by rank-and-file Executive Branch employees. Neither report, therefore, tends to substantiate the Government's administrative efficiency argument, which presumes that abuses may be so widespread as to justify a prophylactic rule. Congress assuredly was inspired by a worthy interest, but it made no effort to establish a connection between its interest and the large-scale inhibition of non-work-related speech by the respondent class. Our cases do not support the notion that the bare assertion of a laudable purpose justifies wide-ranging intrusions on First Amendment liberties. In *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548 (1973), perhaps the closest analogue to this case, we upheld provisions of the Hatch Act, 5 U. S. C. § 7324(a)(2), against a First Amendment challenge only after canvassing nearly a century of concrete experience with the evils of the political spoils system. Cf. *FCC* v. *League of Women Voters of Cal.*,

468 U. S. 364, 401, n. 27 (1984) (noting that the Hatch Act "evolved over a century of governmental experience with less restrictive alternatives that proved to be inadequate to maintain the effective operation of government").

I also agree with the Court that loopholes in the current ethical regime tend to cast doubt upon the gravity of the problem of honoraria abuse, or at least doubt upon the weight of the problem as perceived by Congress and the Office of Government Ethics (OGE). Cf. *City of Ladue* v. *Gilleo*, 512 U. S. 43, 52–53 (1994). Thus, in a provision that detracts seriously from the Government's administrative convenience rationale, the statute permits the author of a series of three speeches or publications (but not of a single speech or publication) to receive an honorarium if the series has no nexus to Government employment. See 5 U. S. C. App. § 505(3) (1988 ed., Supp. V). Under OGE regulations, employees may receive honoraria for poems, but not for speeches on poetry. See 5 CFR § 2636.203(d) (1992). Employees may be compensated for writing chapters in books, but not for writing the same piece if published as an article. *Ibid.* Congress is not required to address every aspect of a problem whenever it decides to act. But the patchwork nature of this regime might reasonably lead one to question the strength of the Government's asserted interests in a broad, prophylactic ban.

The Government, when it acts as employer, possesses substantial leeway; in appropriate circumstances, it may restrain speech that the Constitution would otherwise protect. The Government's prerogatives in this area stem from its public-serving mission as employer. As the plurality observed last year in *Waters*, "[w]hen someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her." 511 U. S., at 675. In this case, however, the Government has exceeded the limits

of its latitude. The bare assertion of interest in a wide-ranging prophylactic ban here, without any showing that Congress considered empirical or anecdotal data pertaining to abuses by lower echelon Executive Branch employees, cannot suffice to outweigh the substantial burden on the 1.7 million affected employees. I agree with the Court that § 501 is unconstitutional to the extent that it bars this class of employees from receiving honoraria for expressive activities that bear no nexus to Government employment.

## II

The class before us is defined by pay scale, not by its members' propensity to write articles without nexus to Government employment. As to any member of the class, the honoraria ban may have unconstitutional applications. But the ban may be susceptible of *constitutional* application to every member of the class, as well. We do not decide the question—a far harder case for respondents, in my view—whether it is constitutional to apply the honoraria ban to speech by this class that bears a relationship to Government employment. I believe that the Court overlooks this nuance when it enjoins all enforcement of § 501 against the class, any one of whose members may, in the future, receive honoraria for work-related activities. I would give respondents relief tailored to what they request: invalidation of the statute insofar as it applies to honoraria they receive for speech without nexus to Government employment. See Brief for Respondents 45–46 (noting that respondents' central aim "could also be achieved by a remedy similar to the one urged by the government—by holding the ban invalid as applied to respondents' writing and speaking activities [that] have no nexus to their federal employment").

I agree with the Court's assertion that the remedy in this case is properly limited to the parties before us. We have long characterized overbreadth analysis as "strong medicine," to be "employed by the Court sparingly and only as a

last resort." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973). Accordingly, we have observed that "[i]t is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily." *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 484–485 (1989); see also *New York* v. *Ferber*, 458 U. S. 747, 768 (1982) (footnotes omitted) ("By focusing on the factual situation before us, and similar cases necessary for development of a constitutional rule, we face 'flesh-and-blood' legal problems with data 'relevant and adequate to an informed judgment' "). The class before us, though defined broadly, consists of people who stand to benefit generally from the invalidation of this statute as applied. Because, as respondents freely admit, their central objective may be achieved by an as-applied challenge, see Brief for Respondents 45–46, I agree that the Court has little warrant to venture into the more difficult and uncertain overbreadth terrain.

Like the dissent, however, I believe that the Court imposes an unduly broad remedy when it enjoins enforcement of the entire provision as to respondent class. There is a commonsense appeal to the Government's argument that, having deemed a particular application of a statute unconstitutional, a court should not then throw up its hands and despair of delineating the area of unconstitutionality. See Brief for United States 38; Reply Brief for United States 15. On its face, the statute contains an exception for a "series" of speeches, appearances, and articles unless "the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government." 5 U. S. C. App. § 505(3) (1988 ed., Supp. V). I see no reason why the nexus principle underlying this general provision cannot serve as the appropriate remedial line.

The Court assumes that it would venture into judicial legislation were it to invalidate the provision as it applies to

no-nexus speech. But it is equally, if not more, inconsistent with congressional intent to strike a greater portion of the statute than is necessary to remedy the problem at hand. Although our jurisprudence in this area is hardly a model of clarity, this Court has on several occasions declared a statute invalid as to a particular application without striking the entire provision that appears to encompass it. In *United States* v. *Grace,* 461 U. S. 171 (1983), for example, the Court addressed the constitutionality of a federal statute making it unlawful to "parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds," or "to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement." 40 U. S. C. § 13k. Finding the statute's extension to public fora inadequately justified, the Court deemed the provision unconstitutional as applied to the sidewalks surrounding the Supreme Court. *Grace, supra,* at 183. In *Tennessee* v. *Garner,* 471 U. S. 1 (1985), the Court invalidated a state provision permitting police officers to use "'all the necessary means to effect the arrest'" of a fleeing or forcibly resisting defendant only insofar as it authorized the use of deadly force against an unarmed, nondangerous suspect. *Id.,* at 4, 22. In *Brockett* v. *Spokane Arcades, Inc.,* 472 U. S. 491 (1985), the Court invalidated a state obscenity statute "only insofar as the word 'lust' is taken to include normal interest in sex." *Id.,* at 504–505.

In *Brockett,* the Court declared: "[W]here the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish, or who seek to publish both protected and unprotected material[,] . . . [t]he statute may forthwith be declared invalid to the extent that it reaches too far, but otherwise left intact." *Id.,* at 504. Of course, we also noted that "[p]artial invalidation would be improper if it were contrary to legislative intent in the sense that the legislature had passed an inseverable Act or would not have passed it had it known the

challenged provision was invalid." *Id.*, at 506. In *Brockett* itself, the state statute contained a severability clause announcing that the remainder of the Act would continue in effect should "any provision of this act or its application to any person or circumstance" be held invalid. *Id.*, at 506, n. 14. Because the opinions in *Grace* and *Garner* made no mention of the existence of statutory severability clauses, these cases can perhaps best be explained as having involved implied severability. After delineating the range of the statute's impermissible applications, the Court implicitly concluded that the legislatures at issue—Congress in *Grace* and the Tennessee Legislature in *Garner*—would have preferred that the remainder of the statutes continue intact. These cases are entirely consistent with our severability precedents, in which we have held that "Congress' silence is just that—silence—and does not raise a presumption against severability." *Alaska Airlines, Inc.* v. *Brock,* 480 U. S. 678, 686 (1987).

As the Court of Appeals noted below, "[s]ection 501(b) does not contain a severability clause, and the legislative history yields no direct evidence of intent concerning severability." 990 F. 2d 1271, 1278 (CADC 1993). Under *Alaska Airlines,* this fact is by no means dispositive; the operative question instead is whether Congress would have promulgated § 501(b) had it known that it could not lawfully proscribe honoraria of employees below GS–16 for activities unrelated to Government employment. See 480 U. S., at 684; Stern, Separability and Separability Clauses in the Supreme Court, 51 Harv. L. Rev. 76, 82–83 (1937) (in dealing with the question of severable applications, the Court asks "whether the legislative body would intend the law to be given effect to whatever extent was constitutionally possible"). I think this question can be answered in the affirmative here. In severing this particular application, we leave the provision intact as to high-level Executive Branch employees and to the Legislative and Judicial Branches. Common sense suggests, and

legislative history confirms, that these Government employees, not the parties to this case, were the statute's principal targets. See, *e. g.,* 990 F. 2d, at 1278 (describing floor debates at which speakers continually referred to abuses by "Members of Congress" as the impetus for reform). As for employees below GS–16, it seems to me clear that Congress would have barred tax examiners from receiving honoraria for lectures on tax policy even if it could not bar the same examiners from receiving honoraria for articles on low-cholesterol cooking. The balance of the provision serves a laudable purpose and is capable of functioning independently once the improper application is excised. Cf. *Alaska Airlines, supra,* at 684.

In sum, I agree with the Court that § 501 is unconstitutional insofar as it bars the respondent class of Executive Branch employees from receiving honoraria for non-work-related speeches, appearances, and articles. In contrast to the Court, I would hold § 501 invalid only to that extent.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

I believe that the Court's opinion is seriously flawed in two respects. First, its application of the First Amendment understates the weight that should be accorded to the governmental justifications for the honoraria ban and overstates the amount of speech that actually will be deterred. Second, its discussion of the impact of the statute that it strikes down is carefully limited to only a handful of the most appealing individual situations, but when it deals with the remedy it suddenly shifts gears and strikes down the statute as applied to the entire class of Executive Branch employees below grade GS–16. I therefore dissent.

I

In 1991, in the aftermath of recommendations by two distinguished commissions, Congress adopted its present ban

on the receipt of honoraria. Congress defined an "honorarium" as

> "a payment of money or any thing of value for an appearance, speech or article (including a series of appearances, speeches, or articles if the subject matter is directly related to the individual's official duties or the payment is made because of the individual's status with the Government) by a Member, officer or employee, excluding, any actual and necessary travel expenses incurred by such individual (and one relative) to the extent that such expenses are paid or reimbursed by any other person, and the amount otherwise determined shall be reduced by the amount of any such expenses to the extent that such expenses are not paid or reimbursed."
> 5 U. S. C. App. § 505(3) (1988 ed., Supp. V).

The ban neither prohibits anyone from speaking or writing, nor does it penalize anyone who speaks or writes; the only stricture effected by the statute is a denial of compensation.

In *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105 (1991), we evaluated the constitutionality of New York's "Son of Sam" law, which regulated an accused or convicted criminal's receipt of income generated by works that described his crime. *Id.*, at 108. We concluded that the law implicated First Amendment concerns because it "impose[d] a financial disincentive only on speech of a particular content." *Id.*, at 116. Because the "Son of Sam" law was content based, we required the State to demonstrate that the regulation was necessary to serve a compelling state interest and was narrowly drawn to achieve that end. *Id.*, at 118. We determined that the State had failed to meet its burden because the statute was overbroad. *Id.*, at 123.

Unlike the law at issue in *Simon & Schuster*, the honoraria ban is neither content nor viewpoint based. *Ante*, at 468; cf. *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989);

*Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 47–48 (1986). As a result, the ban does not raise the specter of Government control over the marketplace of ideas. Cf. *Simon & Schuster, supra,* at 116. To the extent that the honoraria ban implicates First Amendment concerns, the proper standard of review is found in our cases dealing with the Government's ability to regulate the First Amendment activities of its employees.

A public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment. See *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.,* 391 U. S. 563, 568 (1968); *Connick* v. *Myers,* 461 U. S. 138, 140 (1983). We have emphasized, however, that "the State's interests as an employer in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Ibid.* (quoting *Pickering, supra,* at 568). The proper resolution of these competing interests requires "'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" 461 U. S., at 140 (quoting *Pickering, supra,* at 568). Just last Term, a plurality of the Court explained:

> "The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate." *Waters* v. *Churchill,* 511 U. S. 661, 675 (1994).

In conducting this balance, we consistently have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved was on a matter of public concern. *Id.*, at 673–674 (plurality opinion). As we noted in *Connick*, "'the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs.'" 461 U. S., at 151 (quoting *Arnett* v. *Kennedy*, 416 U. S. 134, 168 (1974) (Powell, J., concurring in part and concurring in result)).

These principles are reflected in our cases involving governmental restrictions on employees' rights to engage in partisan political activity.[1] In *Public Workers* v. *Mitchell*, 330 U. S. 75 (1947), we examined § 9(a) of the Hatch Act, which prohibited officers and employees in the Executive Branch of the Federal Government, with exceptions, from taking "'any active part in political management or in political campaigns.'" *Id.*, at 78. We analyzed § 9(a)'s strictures as applied to the partisan political activities of an industrial employee at the United States Mint, and concluded that "[f]or regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service." *Id.*, at 101. Despite the fact that § 9(a) barred three-million public employees from taking "effective part in campaigns that may bring about changes in their lives, their fortunes, and their happiness," *id.*, at 107 (Black, J., dissenting), we held that if in Congress' judgment "efficiency may be best obtained by prohibiting active participation by classi-

---

[1] In *Ex parte Curtis*, 106 U. S. 371 (1882), we upheld a statute that prohibited certain Government employees from giving or receiving money for political purposes to or from other Government employees. *Ibid.* The evident purpose of the statute was to "promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service." *Id.*, at 373. "The decisive principle was the power of Congress, within reasonable limits, to regulate, so far as it might deem necessary, the political conduct of its employees." *Public Workers* v. *Mitchell*, 330 U. S. 75, 96 (1947) (analyzing *Ex parte Curtis, supra*).

fied employees in politics as party officers or workers," there was no constitutional objection, *id.*, at 99.

More than 25 years later, we again addressed the constitutionality of § 9(a) of the Hatch Act. In *Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548 (1973), we "unhesitatingly reaffirm[ed] the *Mitchell* holding," *id.*, at 556, because "neither the First Amendment nor any other provision of the Constitution invalidate[d] a law barring this kind of partisan political conduct by federal employees," *ibid.* We applied the balancing approach set forth in *Pickering* to the Hatch Act's sweeping limitation on partisan political activity, and determined that the balance struck by Congress was "sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act." 413 U. S., at 564. We concluded that "[p]erhaps Congress at some time w[ould] come to a different view of the realities of political life and Government service," but we were in no position to dispute Congress' current view of the matter. *Id.*, at 567.

Although protection of employees from pressure to perform political chores certainly was *a* concern of the Hatch Act, see *ante*, at 471, it was by no means the only, or even the most important, concern.[2] See *Letter Carriers, supra,* at 566. Rather, the Court recognized that a major thesis of the Hatch Act was that

"to serve this great end of Government—the impartial execution of the laws—it is essential that federal employees . . . not take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns, and not run for office on partisan political tickets. Forbidding activities like these will reduce the

---

[2] Prior to the Hatch Act, Congress had prohibited Civil Service employees from " 'us[ing] [their] official authority or influence to coerce the political action of any person or body.' " *Mitchell, supra,* at 79–80, n. 4 (quoting Civil Service Act, ch. 27, § 2, 22 Stat. 404).

hazards to fair and effective government." 413 U. S., at 565.

The Court emphasized that "it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent." *Ibid.* Thus, the Hatch Act served as a safeguard to both the actual and perceived impartiality and effectiveness of the Federal Government. See *Mitchell, supra,* at 95–96; *Letter Carriers, supra,* at 564–567.

Applying these standards to the honoraria ban, I cannot say that the balance that Congress has struck between its interests and the interests of its employees to receive compensation for their First Amendment expression is unreasonable. Cf. *Letter Carriers, supra,* at 564; *Pickering,* 391 U. S., at 568.

The Court largely ignores the Government's foremost interest—prevention of impropriety and the appearance of impropriety—by focusing solely on the burdens of the statute as applied to several carefully selected Executive Branch employees whose situations present the application of the statute where the Government's interests are at their lowest ebb: a mail handler employed by the Postal Service who lectured on the Quaker religion; an aerospace engineer who lectured on black history; a microbiologist who reviewed dance performances; and a tax examiner who wrote articles about the environment. *Ante,* at 461–462. Undoubtedly these are members of the class, but they by no means represent the breadth of the class which includes all " 'employee[s]' . . . below grade GS–16, who—but for 5 U. S. C. app. 501(b)— would receive 'honoraria', as defined in 5 U. S. C. app. 505(3)." App. 124–125. Nothing in the class certification limits the receipt of honoraria to the activities engaged in by the several employees discussed by the Court. See, *e. g.,*

*ante,* at 463, n. 6. This artificially narrow prism of class members, however, is the focus of the Court's entire First Amendment discussion.

The class definition speaks of anyone who would receive an honorarium but for the statute. App. 124–125. An unknown number of these individuals would receive honoraria where there is a nexus between their speech and their Government employment. There is little doubt that Congress reasonably could conclude that its interests in preventing impropriety and the appearance of impropriety in the federal work force outweigh the employees' interests in receiving compensation for expression that has a nexus to their Government employment. Cf. *Federal Election Comm'n* v. *National Right to Work Comm.,* 459 U. S. 197, 210 (1982) ("The governmental interest in preventing both actual corruption and the appearance of corruption of elected representatives has long been recognized").

The Court relies on cases involving restrictions on the speech of private actors to argue that the Government is required to produce "evidence of misconduct related to honoraria in the vast rank and file of federal employees below grade GS–16." *Ante,* at 472; *ante,* at 475–476, and n. 21.[3] The Court recognizes, however, that we " 'have consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large.' " *Ante,* at 475, n. 21 (quoting *Waters,* 511 U. S., at 673 (plurality opinion)).

---

[3] Ironically, the Court engages in unsupported factfinding to justify its conclusion. Thus, its First Amendment analysis is replete with observations such as "[w]ith few exceptions, the content of respondents' messages has nothing to do with their jobs and does not even arguably have any adverse impact on the efficiency of the offices in which they work," *ante,* at 465; and "[b]ecause the vast majority of the speech at issue in this case does not involve the subject matter of Government employment and takes place outside the workplace, the Government is unable to justify § 501(b) on the grounds of immediate workplace disruption." *Ante,* at 470.

Prior to enactment of the current honoraria ban, Congress was informed by two distinguished commissions that its previous limitations on honoraria were inadequate. The 1989 Quadrennial Commission recommended that "Congress enact legislation abolishing the practice of accepting honoraria in all three branches." Fairness for Our Public Servants: Report of the 1989 Commission on Executive, Legislative and Judicial Salaries vi (Dec. 1988). To Serve With Honor: Report of the President's Commission on Federal Ethics Law Reform (Mar. 1989) (hereinafter Wilkey Commission) echoed many of the Quadrennial Commission's concerns:

> "We recognize that speeches by federal officials can help inform the public or particular groups and may encourage interchange between the public and private sectors. Nevertheless, we can see no justification for perpetuating the current system of honoraria. *Honoraria paid to officials can be a camouflage for efforts by individuals or entities to gain the officials' favor.* The companies that pay honoraria and related travel expenses frequently deem these payments to be normal business expenses and likely believe that these payments enhance their access to public officials who receive them. . . .
>
> "Although we are aware of no special problems associated with receipt of honoraria within the judiciary, the Commission—in the interest of alleviating abuses in the legislative branch and in applying equitable limitations across the government—joins the Quadrennial Commission in recommending the enactment of legislation to ban the receipt of honoraria by all officials and employees in all three branches of government." *Id.*, at 35–36 (emphasis added).

The Wilkey Commission "recognize[d] that banning honoraria would have a substantial financial cost to many officials," *id.*, at 36, but determined that "the current ailment is

a serious one and that this medicine is no more bitter than is needed to cure the patient," *ibid.* The Wilkey Commission also was aware that its recommendations covered not only high-level federal employees,[4] but it "regard[ed] the current state of affairs as to honoraria in particular as unacceptable in the extreme, and believe[d] that [the Government could not] wait until an unspecified date in the future to end this harmful practice." *Id.*, at 38.[5]

The Court concedes that in light of the abuses of honoraria by its Members, Congress could reasonably assume that "payments of honoraria to judges or high-ranking officials in the Executive Branch might generate a similar appearance of improper influence," *ante*, at 473, but it concludes that Congress could not extend this presumption to federal em-

---

[4] "The Commission also considered whether it was appropriate to impose a flat ban on outside earned income by all federal employees, or in the alternative, by the highest paid federal employees. In view of the diverse circumstances of federal employees, we felt that an across-the-board ban on outside earned income was unnecessary and too harsh." Wilkey Commission 38.

[5] The Court discusses a report of the General Accounting Office (GAO) to refute the argument that there is some evidence of misconduct related to honoraria in the rank and file of federal employees below grade GS–16. *Ante*, at 472, n. 18 (citing General Accounting Office, Report to the Chairman, Subcommittee on Federal Services, Post Office and Civil Service of the Senate Committee on Governmental Affairs, Employee Conduct Standards: Some Outside Activities Present Conflict-of-Interest Issues (Feb. 1992) (hereinafter GAO Report)). The GAO audited 11 agencies' controls over outside activities by employees. *Id.*, at 2. The GAO Report reflects that under the prior regime, some agencies exhibited "overly permissive approval policies," *ibid.*, and "five agencies approved some outside activities, such as speaking and consulting, that appeared to violate the standard of conduct prohibiting the use of public office for private gain," *ibid.* Nine of the eleven agencies reviewed had "approved outside activities in situations that involved potential violations of standard-of-conduct regulations or conflict-of-interest statutes." *Id.*, at 58. Nevertheless, the Court maintains that there is no evidence of even the appearance of impropriety by employees below grade GS–16. Cf. *ante*, at 472, n. 18.

ployees below grade GS–16. The theory underlying the Court's distinction—that federal employees below grade GS–16 have negligible power to confer favors on those who might pay to hear them speak or to read their articles—is seriously flawed. Tax examiners, bank examiners, enforcement officials, or any number of federal employees have substantial power to confer favors even though their compensation level is below grade GS–16.

Furthermore, we rejected the same distinction in *Public Workers* v. *Mitchell:*

> "There is a suggestion that administrative workers may be barred, constitutionally, from political management and political campaigns while the industrial workers may not be barred, constitutionally, without an act 'narrowly and selectively drawn to define and punish the specific conduct.' . . . Congress has determined that the presence of government employees, whether industrial or administrative, in the ranks of political party workers is bad. Whatever differences there may be between administrative employees of the government and industrial workers in its employ are differences in detail so far as the constitutional power under review is concerned. Whether there are such differences and what weight to attach to them, are all matters of detail for Congress." 330 U. S., at 102.

Congress was not obliged to draw an infinitely filigreed statute to deal with every subtle distinction between various groups of employees. See *Letter Carriers*, 413 U. S., at 556; *Mitchell, supra*, at 99.

The Court dismisses the Hatch Act experience as irrelevant, because it aimed to *protect* employees' rights, notably their right to free expression, rather than to restrict those rights. *Ante*, at 471. This is, indeed, a strange characterization of § 9(a) of the Hatch Act. It prohibited officers

and employees in the Executive Branch of the Federal Government from taking "'any active part in political management or in political campaigns.'" *Mitchell, supra,* at 78. The penalty for violation was dismissal from office. 330 U. S., at 79. Since the right to participate in a political campaign is surely secured in the abstract by the First Amendment, see, *e. g., Buckley* v. *Valeo,* 424 U. S. 1, 15 (1976) *(per curiam),* it can hardly be said that the Act *protected* the rights of workers who wished to engage in partisan political activity. One of the purposes of the Act was assuredly to free employees who did not wish to become engaged in politics from requests by their superiors to contribute money or time, but to the extent the Act protected these employees it undoubtedly limited the First Amendment rights of those who did wish to take an active part in politics.

The Government's related concern regarding the difficulties that would attach in administering a case-by-case analysis of the propriety of particular honoraria also supports the honoraria ban's validity. As we emphasized in *Waters,* "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." 511 U. S., at 675. Congress reasonably determined that the prior ethics regime, which required these case-by-case determinations, was inadequate. See App. 257 ("[T]he current state of affairs as to honoraria [is] unacceptable in the extreme"). As a subsequent 1992 GAO Report confirmed, individual ethics officers and various agencies gave differing interpretations to the nexus requirement, and some "approved activities that were questionable as to the appropriateness of accepting compensation." GAO Report, at 9.

The Court observes that because a nexus limitation is retained for a series of speeches, it cannot be that difficult to enforce. *Ante,* at 474. The exception that the honoraria ban

makes for a "series of appearances, speeches, or articles," far from undermining the statute's basic purpose, demonstrates that Congress was sensitive to the need for inhibiting as little speech consistent with its responsibility of ensuring that its employees perform their duties impartially and that there is no appearance of impropriety. Reply Brief for United States 12–13. One is far less likely to undertake a "series" of speeches or articles without being paid than he is to make a single speech or write a single article without being paid. Congress reasonably could have concluded that the number of cases where an employee wished to deliver a "series" of speeches would be much smaller than the number of requests to give individual speeches or write individual articles.

Unlike our prototypical application of *Pickering* which normally involves a response to the content of employee speech, the honoraria ban prohibits no speech and is unrelated to the message or the viewpoint expressed by the Government employee.[6] Cf. *Waters, supra,* at 664–666 (plurality opinion) (analyzing termination of an employee based upon statements critical of the employer); *Rankin* v. *McPherson,* 483 U. S. 378, 381–382 (1987) (analyzing termination of an employee based upon a comment about an attempted assassination of President Reagan); *Pickering,* 391 U. S., at 564 (analyzing termination of an employee based upon a letter critical of the school board). Furthermore, the honoraria ban exempts from its prohibition travel and other expenses re-

---

[6] The Court's fanciful example of an employer terminating an employee because of the disruptive effect of the employee's expression even where the employer agrees with the expression, *ante,* at 467, n. 11, does not detract from the fact that viewpoint and content neutrality are important factors in evaluating the reasonableness of the public employer's action. See, *e. g., Civil Service Comm'n* v. *Letter Carriers,* 413 U. S. 548, 564 (1973) ("The restrictions so far imposed on federal employees are not aimed at particular parties, groups, or points of view. . . . Nor do they seek to control political opinions or beliefs, or to interfere with or influence anyone's vote at the polls").

lated to employee speech. See 5 U. S. C. App. § 505(3) (1988 ed., Supp. V); 5 CFR § 2636.203 (1994). Because there is only a limited burden on respondents' First Amendment rights, Congress reasonably could have determined that its paramount interests in preventing impropriety and the appearance of impropriety in its work force justified the honoraria ban. See *Civil Service Comm'n* v. *Letter Carriers, supra; Public Workers* v. *Mitchell,* 330 U. S. 75 (1947).

There is a special irony to the Court's decision. In order to combat corruption and to regain the public's trust, the Court essentially requires Congress to resurrect a bureaucracy that it previously felt compelled to replace and to equip it with resources sufficient to conduct case-by-case determinations regarding the actual and apparent propriety of honoraria by all Executive Branch employees below grade GS–16. I believe that a proper application of the *Pickering* test to this content-neutral restriction on the receipt of compensation compels the conclusion that the honoraria ban is consistent with the First Amendment. See *Civil Service Comm'n* v. *Letter Carriers,* 413 U. S. 548 (1973).

## II

One would expect, at the conclusion of its discussion in Parts I–IV, for the Court to hold the statute inapplicable on First Amendment grounds to persons such as the postal worker who lectures on the Quaker religion, and others of similar ilk. But the Court in Part V, in what may fairly be described as an O. Henry ending, holds the statute inapplicable to the entire class before the Court: all Executive Branch employees below grade GS–16 who would receive honoraria but for the statute. Under the Court's "as applied" remedy, § 501(b) would not apply regardless of whether there was a nexus between the compensation and the individual's employment. Even if I agreed that application of the honoraria ban to expressive activity unrelated to an employee's Gov-

ernment employment violated the First Amendment, I could not agree with the Court's remedy.[7]

In *United States* v. *Grace*, 461 U. S. 171 (1983), we analyzed the constitutionality of 40 U. S. C. § 13k (1982 ed.), as applied to the public sidewalks surrounding the Supreme Court. Section 13k prohibited, "among other things, the 'display [of] any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement' in the United States Supreme Court building and on its grounds." 461 U. S., at 172–173 (quoting § 13k). We concluded that there was insufficient justification for § 13k's prohibition against carrying signs, banners, or devices on the public sidewalks surrounding the building. *Id.*, at 183. As a remedy, we held that § 13k was "unconstitutional as applied to those sidewalks." *Ibid.*; see also *Edenfield* v. *Fane*, 507 U. S. 761, 763 (1993) (striking down a ban on solicitation by certified public accountants as applied to the "business context").

Although the Court limits its analysis to only those applications of the honoraria ban where there is no nexus between the honoraria and Government employment, the Court prohibits application of the honoraria ban to all Executive Branch employees below grade GS–16 even where there is a nexus between the honoraria and the employees' Government employment. *Ante*, at 479–480.[8] Even respondents acknowledge that the central aim of their litigation could "be achieved by a remedy similar to the one urged by the government—by holding the ban invalid as applied to respond-

---

[7] Lost in the shuffle of the Court's remedy is Peter Crane, a GS–16 lawyer from the Nuclear Regulatory Commission, and a respondent before the Court. *Ante*, at 461. Although the rationale behind the Court's holding does not necessarily apply to Crane, see *ante*, at 478, n. 23, the Court's holding apparently does.

[8] Because the Court has rewritten the honoraria ban so that it no longer applies to Executive Branch employees below grade GS–16, I certainly could not condemn the Court for its refusal to rewrite the statute. Cf. *ante*, at 479, n. 26. I simply challenge the Court's failure to tailor its remedy to match its selective analysis.

ents' writing and speaking activities, which have no nexus to their federal employment." Brief for Respondents 45–46.

Consistent with our approach in *Grace, supra,* if I were to conclude that § 501(b) violated the First Amendment, I would affirm the Court of Appeals only insofar as its judgment affirmed the injunction against the enforcement of § 501(b) as applied to Executive Branch employees below grade GS–16 who seek honoraria that are unrelated to their Government employment.